# JOY ANN ROBEY v. STATE OF MARYLAND

[No. 247, September Term, 1982.]

*Decided March 4, 1983.*

The cause was submitted on briefs to MORTON, WILNER and BISHOP, JJ.

Submitted by *Alan H. Murrell, Public Defender,* and *Martha Weisheit, Assistant Public Defender,* for appellant.

Submitted by *Stephen H. Sachs, Attorney General, Stephen B. Caplis, Assistant Attorney General, Warren B. Ducket, Jr., State's Attorney for Anne Arundel County,* and *Valerie Watts, Assistant State's Attorney for Anne Arundel County,* for appellee.

BISHOP, J., delivered the opinion of the Court.

The question presented by this case is whether a parent who was temporarily insane when she beat her child may nonetheless be held criminally responsible for failing to seek necessary medical care for the child during subsequent periods of lucidity. We hold that she can be held responsible, and consequently affirm her conviction.

## I.

### The Facts

The unfortunate course of events that gave rise to this question requires some elaboration.

On October 8, 1980, Christina Marie Hensley was born. Eight months later, on June 9, 1981, she died as a result of severe beatings inflicted on her by her mother, Joy Ann Robey, the appellant. In her statement to Detective Gary Barr, Joy Ann described Christina's final moments:

> "I heard Christina in her room about six o'clock this morning, she was crying a little, this is the way she sounds when she wants her bottle. I took her bottle of formula into her and gave it to her, I then left the room and went back to my room. About five minutes later I heard her crying again, so I thought she had lost her bottle, so I went back into the room and she had lost her bottle. I looked down at her and I saw blood coming out of the left side of her mouth, I then picked her up and I then saw the blood

coming out of her nose also. I noticed that she was having trouble breathing, so I layed her on Mina's bed, and I touched her stomach and it was hard, and white stuff started coming out of her nose, she was breathing in and was making a funny type of face, and her lips were blue. I picked her up and went to the car. I put her in the car and drove to Larry's work in Clinton Maryland. When I got to where Larry's work is, I saw Larry and his boss. There was some other guy named Wade there too, Larry came over to me and asked me what was wrong, I told him I did not know it was Christina. Larry then hollered for Wade, because he works for the fire department, he came over looked at Christina's eyes and then took her over to a truck. Wade tried giving her CPR and then they took her to the hospital."

After arrival at the hospital, Christina was pronounced dead.

Joy Ann then went on to describe Christina's last 30 days:

"Q. Joy why did you take Christina to Clinton Maryland instead of taking her to a hospital close to your house?

A. I just wanted Larry.

Q. Joy was Christina sick prior to her death?

A. I think she had a cold.

Q. Joy where did the bruises on Christina's body come from?

A. From me.

Q. You said the bruises came from you can you explain?

A. They came from me hitting her.

Q. Joy why did you hit Christina?

A. I hit her because she was crying.

Q. Joy the body of Christina, contained bruises on the back, the legs, the chest, and the stomach, were all of these from you hitting her because she was crying?

A. Yes they were.

Q. Joy there was also cuts to the upper and lower lips of Christina, how did this happen?

A. On Sunday I slapped her in the mouth, this was Sunday night.

Q. Joy, Christina also had a fractured skull, do you know how this happen[ed]?

A. I think it happen[ed] Sunday when I slapped her in the mouth, she was sitting in her walker and her head hit the wall.

Q. The bruises to Christina's back, how and when did you cause this?

A. On Saturday she was crying and wouldn't stop, nothing I would do would make her stop, she was lying in the crib on her stomach, and I talked to her a minute, and I just started hitting her with my hand.

Q. Joy, do you know how many times you hit Christina on the back?

A. It was about six times, I know what I was doing.

Q. Within the last three or four days, besides the back and face did you hit Christina anywhere else on her body?

A. I could have hit her in the side to[o], I just don't know.

Q. Joy, Christina also had several broken ribs how did this occur?

A. A couple of months ago I hit [her] several times in the chest.

Q. Joy, when was the last time Christina was taken to a doctor?

A. The day she was born, which was eight months ago, October 8th.

Q. Joy, did you ever hit Christina with anything other than your hands?

A. No.

* * *

Q. Joy, all of the bruises on Christina's body that we saw, is all of this since she has been back with you for a month?

A. Yes.

Q. Joy, after you would beat Christina what would you do with her then?

A. I would pick her up and hold her and cry about what I had done.

Q. Joy, why would you beat Christina like you did?

A. Because of her crying, and because of my temper, it was if she knew it bothered me.

Q Joy, didn't you realize that after the beating that Christina needed medical attention.

Q. No, I didn't know that anything was seriously wrong with her.

* * *

Q. Joy during the beatings of Christina were you aware of what you were doing?

A. Yes, I was always aware of what I was doing.

* * *

Q. Christina also had a[n] old fracture of the leg, can you account for this?

A. I don't know how it happen[ed], it could have happened when I was beating her, because I did hit her on the legs several times in the past.

Q. Joy from the condition of the body of Christina, is this one of the reasons you didn't take her to a doctor, because you worried he would know about the beatings?

A. Yes.

Q. Joy, how long has Christina had trouble with her breathing?

A. About three or four days almost a week.

\* \* \*

Q. Joy did you know that the beatings you were giving Christina was wrong?

A. Yes.

Q. Do you believe that the beatings you gave Christina led to her death?

A. I don't really think so, I don't know.

Q. Joy, didn't you realize that an eight month old baby can't take this type of abuse without seriously being injured?

A. In a way I did, and in another way I didn't, I didn't realize how hard I was hitting the baby.

Q. Joy, if Mina was returned to you would you continue to beat her?

A. I don't know.

Q. Joy, previously you said that you were always aware of what you were doing, then why did you continue to beat Christina, when you knew it was wrong?

A. I thought it would make her be [quiet] but it never did."

Dr. Robert L. Galiero, a specialist in internal medicine and in emergency medicine, saw Christina at approximately 8:00 A.M. on June 9th, 1981, in the emergency room at Southern Maryland Hospital. When Christina was brought

into the hospital, Dr. Galiero observed that "the child was not breathing, had no cardiac rate at all and the pupils were dilated." Regardless of this, attempts to revive Christina were continued for another ten minutes, without success.

Dr. Galiero testified that after a close examination of Christina, he found that

> "There were bruises along the entire left lower chest wall and upper abdominal wall, there was a bruise next to the umbilicus on the left side, on the forward part or interior part of the legs there was a bruise on the right thigh and the left leg near the knee, and there were extensive bruises down the whole center of the back and the right side of the back."

Next, Dr. Robert S. Frankel, a radiologist practicing at the Southern Maryland Hospital Center, based on reading the films· from a radiological bone survey of the child's body reported:.

> "There is a . . . skull fracture. . . . There are multiple fractures of the ribs bilaterally in varying stages of healing. These fractures involve the 5th, 6th, 7th, 8th, 9th and 10th ribs on the right and the 4th, 5th, 6th, 7th, 8th, 9th, 10th, and 11th ribs on the left. Fracture of the left 7th rib appears somewhat more acute and could be within several days of age. There is a healed fracture involving the [right upper arm]. There are slight deformities of the right [lower arm], again compatible with old fractures. There are healed fractures of the right [lower leg]. There is a subacute appearing fracture of the distal shaft of the left [lower leg].
>
> IMPRESSION: The radiographic findings are those of multiple fractures in the ribs, long bones, and skull of varying ages. From the radiographic point of view, a diagnosis of severely post traumatized patient should be a major diagnostic consideration."

The radiologist's testimony gave a better perspective to Christina's condition:

> Q. Are you able to tell the age of the fractures, Doctor Frankel?
>
> A. ... The one on the right [lower leg] is probably several weeks old, the one on the left is more likely acute or sub-acute, it could be within hours or days. This is a radiograph of the patient's thorax and upper extremities. On the right side there's a healing fracture of the humerus. There are multiple fractures of ribs at both sides. The rib fractures essentially involved all of the ribs, and again they're in various stages of acuteness. Most of them appear to be probably between a week and several weeks old. ...
>
> Q. Can you tell the age of that fracture of the skull?
>
> A. No, that's — it's difficult to say whether that's acute, it's not older than three or four weeks because there's no bone formation around the fracture [site]. So it's anywhere from being acute to probably three weeks old.

* * *

> Q. Doctor Frankel, would you be able to determine from the injuries that the X-rays indicated what effect that would have on the general physical condition of Christina Marie Hensley?
>
> A. Well, I assume that the physical condition would be quite poor in a patient who has multiple fractures involving multiple areas of the body."

Dr. Anne Dixon, an Assistant Medical Examiner, performed the autopsy on Christina on June 10th, the day after her death. Pertinent to this opinion are the following excerpts from the autopsy report:

DIAGNOSES:

1. Multiple injuries:

   a. bilateral rib fractures, fresh
   b. pulmonary contusions
   c. liver lacerations
   d. hemoperitoneum
   e. contusion of floor of mouth
   f. lacerations and abrasions of lips
   g. multiple scattered cutaneous contusions and superficial abrasions

2. Multiple, healed/healing rib fractures, bilateral
3. Multiple fractures of long bones of extremities
4. Old, healed skull fractures

OPINION:

This 10 month old white female, Christina M. Hensley, died as a result of multiple blunt force injuries to the chest and abdomen. Radiologic examination reveals multiple, old fractures of long bones in addition to multiple rib fractures. The different stages of healing indicate more than one previous episode of blunt force trauma. The manner of death is homicide."

Dr. Dixon testified that based on her autopsy, it was her expert reasonably certain medical opinion that the cause of Christina's death was "multiple blunt force injuries to the chest and abdomen ... involving multiple ribs, lungs, liver, associated hemorrhage plus the external bruises and abrasions. ..."

Detective Gordon March viewed Christina's body at the hospital shortly after she was pronounced dead. His description of the body was in layman's terms:

"As I observed the body I noticed a slit upper and lower lip. I also noticed a laceration on the bridge of the nose, contusions up and down the entire back of

the child, contusions on both sides of the child, right and left side, going from the hips all the way up to the arms on both sides. There were contusions on the chest area, the complete chest area of the child. Contusions to the abdomen, contusions to the right thigh, contusions to the right knee, contusions to the left knee and to the left lower leg. There was an abrasion to the right side of the — of the child. The abdomen was extended and there was slight discoloration. The abdomen was very hard. Also, the tongue of the child was lacerated, both the underneath side of the tongue and the top part of the tongue had lacerations to it. There was a rash in the genital area of the child. The child was very dirty."

Shortly thereafter Detective March interviewed the appellant. He was asked at trial to describe her behavior. He responded:

"Well, she was — emotionally she was upset, she was crying at the time, she would cry, then she would stop crying, and she would — she would say why are you doing what you're doing, and I would explain to her that was because of the condition of the child, she said there were no bruises on that child at that time, the first time we spoke to her.

Q. Detective March, have you had an opportunity to observe anyone under the influence of alcohol during your tenure as a police officer?

A. Yes, ma'am.

Q. Did the defendant appear to be under the influence of alcohol at that time?

A. No, ma'am, she did not."

He added that "Mrs. Robey denied any type of abuse to the child, Christina. . . ."

Later that day, however, appellant gave the statement, *supra*. The detective described appellant's later demeanor:

"Well, at the beginning at the hospital she was very upset. When the statement was taken she had calmed down quite a bit to the point where at one minute she was sitting there and she was very friendly, very cooperative, she would be laughing and then the next minute she would be crying, and this would be on and off over the period of an hour so that that statement was taken."

Detective Gary Barr, who was present at the time Detective March took the statement, described the appellant's demeanor:

"When I first met Joy Ann Robey and had the situation explained, the details of how she came to be at CID Headquarters by Detective March, I was taken back by her attitude. When I saw her I expected to find someone who was totally upset and crying hysterically, that was my initial expectation, and I found her to be very calm and collected about her thoughts and was willing to talk to us freely, and during the course of the interview, this time period when we took the interview, her emotions suddenly ran the gamut. She went from calm to extensive crying, back to calm again, laughing, almost every possible emotion was displayed."

The defense psychiatrist testified that after each beating, the appellant ". . . would snap out of it and . . . she would feel extremely guilty, then she would realize what had happened, she would feel extremely guilty, she would cry, etcetera . . . she described this very clearly to me."

And the court observed:

"COURT: Well, what happens when you have a series of acts over a period of time. I mean you have

the — if I understand, you have the individual losing control, then snapping out of it, seeing what happened, then the situation repeating itself, maybe twice, five times, ten times, maybe for several months.

\* \* \*

What bothers me is it — we have the individual losing control of themselves, then apparently coming back down and seeing what happens, does nothing, obviously, then they go on for another period of time, another incident repeating itself, losing control, the situation then becoming exacerbated, then coming back to normality, seeing nothing."

Dr. Bosma responded:

"A. You know, in psychiatric illness in most instances the patient does not learn from the experience because at the time that there is loss of control or loss of contact with reality — there is loss of contact with reality she does not remember, she does not realize there is no contact with the reality of the situation."

The exchange continued:

"COURT: But when she comes out of that state of mind then how would you characterize her conduct?

A. As depressed —

COURT: In other words, seeing the child battered?

A. Depressed, guilty, understanding, all that, yeah. She — after this happens she understands what has happened, and I talked it over with her, she cried during the interview, she felt guilty, she said somewhere, I quoted her, 'I did not want to do any harm to my children.' I know the intent — there

was never an intent to do harm, to these children, to that child."

Dr. Bosma concluded his testimony by pointing out that the appellant was suffering from an intermittent explosive disorder, a general psychiatric category that was atypical because it was directed only toward her children, and not generally. Finally he testified

"At the time that this happened she lacked sub-stantial capacity. At the time that this happened, now she knows. Immediately after it happened and it was stopped she knew, yes, that's the problem."

The State conceded and the court agreed that there was sufficient evidence of appellant's insanity to rebut the pre-sumption of sanity. The State's psychiatrists diagnosed reactive depression and found the appellant to be responsi-ble for the beatings, but the defense psychiatrist, as pointed out above, found that appellant also suffered from an atypical impulse disorder and a dependent personality disorder. As a result of these disorders, the baby's cries triggered an intermittent explosive disorder, during which appellant would lose control and beat the child until its cries subsided. Immediately after each beating episode, appellant would regain her self-control and feel remorse.

Based on this and other evidence the trial court found that appellant was insane each time she beat her infant daugh-ter, but sane thereafter. Consequently, she could not be held responsible for beating the baby, but could be held responsi-ble for failing to seek medical care for the battered child after regaining self-control. The court based its ruling on statute and case law holding that a parent of an infant child has an independent duty imposed by statute to preserve the child's health, even when the parent is not responsible for inflicting the injury. Because appellant grossly neglected to perform this duty, the lower court adjudged her guilty of involuntary manslaughter and child abuse.[1] On January 26,

---

1. The court did not explicitly rule on the third count of common law assault and battery, or the fourth count of common law assault. However,

1982, the court sentenced appellant to three [2] concurrent ten-year terms in the custody of the Division of Correction.

Appellant asseverates that the trial court erred in holding her criminally responsible despite its acknowledgment that she was insane while inflicting the beatings. We hold, however, that the trial court properly found the insanity defense inapplicable to appellant's subsequent neglect of her child's health.

## II.

### The Insanity Defense

The purpose of the insanity defense is to ensure that the criminal sanction is imposed only on those who had the cognitive and volitional capacity to comply with the law. *Bethea v. United States,* 365 A. 2d 64, 72 (D.C. 1976). *See generally* W. LaFave & A. Scott, Handbook on Criminal Law §36 at 271-72 (1972). Persons whose mental disorders deprive them of this capacity are neither culpable nor deterrable, and thus "ought not to be subject to the same penalties or treatment as are justly meted out to those who are sane." *Devilbiss v. Bennett,* 70 Md. 554, 556 (1889). *Accord Deems v. State,* 127 Md. 624, 627 (1916); *Young v. State,* 14 Md. App. 538, 541 (1972). This rationale for exemption from the criminal sanction extends only to those who are mentally incapacitated during commission of the offense; only insanity at the time of the crime can excuse a defendant.

The law has long recognized this temporal qualification. In 1628 Sir Edward Coke described as one form of *non compos mentis,* the lunatic, who has lucid intervals but is

---

its finding that appellant was insane while beating Christina implies that, as to these counts, appellant was not responsible by reason of insanity.

**2.** Appellant was also convicted under a separate indictment of assault and battery upon her two year old daughter, Mina. The insanity defense did not apply to this beating because there was no evidence that it was triggered by a crying incident. As the trial court wryly observed, "Apparently, at this stage of her life Mina has learned to be quiet."

*non compos mentis* during those periods when he "hath not understanding." 2 Co. Litt. 247 a (Rev. ed. 1823) as cited in R. Perkins, Criminal Law 851 (2d ed. 1969). It has become black-letter law that, "even an adjudged lunatic will be held criminally responsible for acts committed during a lucid interval." 21 Am. Jur. 2d, Criminal Law, §52 at 171 (1981); 22 C.J.S. Criminal Law §58 at 197-98. *Todd v. Melcher,* 462 P.2d 850, 853 (Ariz. 1970); *McConnell v. People,* 402 P.2d 75, 77 (Colo. 1965). A jury could find that a defendant suffering varying degrees of mental disorder, such as periodic schizophrenia, was nonetheless sane when committing a crime. *State v. Newson,* 164 N.W.2d 211 (Neb. 1969); *State v. Bertone,* 188 A.2d 599, 603 (N.J. 1963); *State v. Gleason,* 405 P.2d 793 (Utah 1965). Moreover, a criminal defendant who has been adjudged insane and committed to a mental hospital could be held responsible for crimes committed upon escaping from the hospital while sane. *Bonner v. State,* 164 S.E.2d 453 (1968); *Apolinar v. State,* 244 S.W. 813 (Tex. 1922). *See also Fisher v. Fraser,* 233 P.2d 1066 (Kan. 1951). In sum, the case law, consistent with the purposes of the insanity defense, requires that a defendant's episodic mental disorder render him insane at the time of the crime for the defense to apply.

The law in Maryland has historically acknowledged this qualification. The State's first statutory recognition of the insanity defense, enacted in 1826, extended the defense to a defendant who "was, *at the time of the commission of such offence,* or still is, insane, lunatic or otherwise. . . ." Acts of 1826, Ch. 197 (emphasis added). The M'Naghten test, adopted in *Spencer v. State,* 69 Md. 28 (1888) held a person responsible "if *at the time of the commission of the alleged offense,* he had capacity and reason sufficient to enable him to distinguish between right and wrong, and understand the nature and consequences of his act. . . ." *Id.* at 37.

In *Bergin v. State,* 1 Md. App. 74 (1967), one of the last decisions applying this standard, a criminal defendant who was found insane while committing a crime was committed to a mental hospital. When the hospital authorities later

determined that he was sane and could not be held without his consent, he obtained a weekend pass and attempted to commit an armed robbery. A jury found him sane at the time of this crime. This Court affirmed his conviction on grounds that, despite his prior adjudication of insanity, there was sufficient evidence of his sanity at the time of the armed robbery to hold him responsible for his acts.

In 1967, shortly after the *Bergin* decision, the General Assembly supplanted the *M'Naghten-Spencer* test with the American Law Institute test for criminal responsibility. Md. Ann. Code, Art. 59, §9 (1968 repl. vol.); Acts of 1967, Ch. 709. After additional emendation in the laws of 1970, Chapter 407, this new test, applicable to this case, provided that:

> "A defendant is not responsible for criminal conduct and shall be found insane *at the time of the commission of the alleged crime if, at the time of such conduct as a result of mental disorder,* he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law."

Md. Ann. Code, Art. 59, §25 (1979 repl. vol.) (emphasis added).[3] This provision has, in turn, been replaced by section 12-107 of the Health-General Article (1982 vol.) which provides:

> "A defendant is not responsible for criminal conduct if, *at the time of that conduct,* the defendant, because of mental retardation or a mental disorder, lacks substantial capacity:
>
> (1) To appreciate the criminality of that conduct; or
>
> (2) To conform that conduct to the requirements of law." (Emphasis added).

---

**3.** Article 59, section 3 (g) also obviated such terms as "lunary" in favor of the general term, "mental illness." See generally Young v. State, 14 Md. App. 538, 540-45 (1972) (history of insanity defense).

Construing this provision to effectuate its intended purpose, we hold that the insanity defense only excuses the defendant who lacks the requisite cognitive or volitional capacities at the time of the commission or omission that allegedly violates the criminal law.

In this case, appellant adduced sufficient evidence of mental disorder to rebut the presumption of sanity. *See, e.g., Millard v. State,* 8 Md. App. 419 (1970); *Bradford v. State,* 234 Md. 505, 17 A.L.R. 3d 134 (1964); *Lipscomb v. State,* 223 Md. 599, 604 (1960). The burden then shifted to the State to prove her sanity beyond a reasonable doubt. *State v. Pratt,* 284 Md. 516, 524 (1979); *Jenkins v. State,* 238 Md. 451, 463 (1965); *Strawderman v. State,* 4 Md. App. 689, 697-98 (1968). Appellant contends that there was insufficient evidence to warrant the trial court's conclusion that she was insane during commission of the beatings, but sane thereafter, when she omitted to seek medical care for the battered child. We find, however, that the trial court's conclusion is supported by the evidence. Dr. William Bosma, the defense psychiatrist, testified that appellant's intervals of insanity were actuated by and coextensive with the baby's cries. Immediately upon cessation of Christina's cries, appellant would regain her rationality and self-control.

The defense psychiatrist also found that appellant had a good memory of recent and remote events, knew that she had beaten the baby, and felt guilty for her actions. Appellant's confession, recounting specific instances of child beating, corroborates the psychiatrist's opinion.

Based on this and other evidence, the trial court rendered a special verdict finding appellant responsible after the beatings. *See Langworthy v. State,* 284 Md. 588, 593 (1979); *Turner v. State,* 5 Md. App. 584, 590 (1968). Its verdict concerning appellant's varying mental state was not clearly erroneous. Maryland Rule 1086. *Rozzell v. State,* 5 Md. App. 167, 178 (1968); *Saldiveri v. State,* 217 Md. 412, 424 (1958). Thus, the trial court correctly concluded that the insanity defense was inapplicable to appellant's omission to seek medical care.

III.

*Culpability for not seeking Medical Care.*

The law requires parents to obtain necessary medical care for their minor children. Md. Ann. Code, Art. 72A, §1 (1978 repl. vol.); *Powley v. Owens,* 49 Md. App. 349, 353 (1981); *Levitsky v. Levitsky,* 231 Md. 388, 397 (1963). This is an independent duty, gross neglect of which subjects the parent to criminal sanction. Md. Ann. Code, Art. 27, §35A (1982 repl. vol.); *Pope v. State,* 284 Md. 309, 318-20 (1979); *Craig v. State,* 220 Md. 590, 596 (1959).

In *State v. Fabritz,* 276 Md. 416 (1975), for example, a mother failed to seek medical attention for her three year old child, who had been severely beaten by a neighbor. After the child died of the injuries a jury convicted the mother of child abuse. The Court of Appeals affirmed because, as it later stated in *Pope v. State, supra,* 284 Md. at 319:

> "The failure of the mother to seek or obtain any medical assistance for her child, although the need therefor was obviously compelling and urgent, caused the child to sustain bodily injury additional to and beyond that inflicted upon the child by reason of the original assault by another."

Similarly, in *Palmer v. State,* 223 Md. 341 (1960), a mother was found criminally negligent for allowing her paramour to inflict upon her twenty month-old child prolonged and brutal beatings over a series of weeks, ultimately resulting in the child's death. The Court affirmed the conviction on the ground that the mother could have removed her child from this clearly harmful environment.

Appellant attempts to distinguish *Palmer* and *Fabritz,* which were cited by the trial court, on the ground that the beatings in those cases were inflicted by third parties, whereas the beatings in this case were inflicted by the parent. This misses the point. *Palmer* and *Fabritz* are apposite precisely because they hold that a parent, though not responsible for the original injury to her child, may

nonetheless be found criminally negligent for omitting to obtain necessary medical care for the child. We do not impose a new duty to mitigate damage caused during temporary periods of insanity; we merely apply a preexisting parental duty to provide necessary medical care for minor children, irrespective of the source of their injuries. *See generally,* Note, "Criminal Liability of Parent for Omission Causing Death of Child," 21 U. Md. L. Rev. 262 (1961). In this case, as in *Fabritz,* "the act of omission by the mother 'constituted a cause of the further progression and worsening of the injuries which led to [the child's] death. . . ." *Pope v. State, supra,* 284 Md. at 319.

The only sense in which *Fabritz* is distinguishable from this case is the apparency of the child's injuries. In *Fabritz v. Traurig,* 583 F. 2d 697 (1978), the Fourth Circuit ordered that a writ of habeas corpus be granted to Virginia Fabritz, the mother who neglected to obtain medical care for her battered child, because

> "Fabritz' error amounted to a failure to procure medical attention in less than eight hours after her arrival at home. Without expert medical knowledge to place her on notice of the fatal nature of the child's illness, she treated her as best she knew. The misjudgment was only to the significance of the symptoms and of the immediacy of demand for professional care. In these circumstances the conviction cannot stand — without even so much as murmur of evidential justification."

*Id.* at 700.

In this case, by contrast, the record evinces that appellant inflicted severe injuries upon Christina over a series of weeks — not hours. The evidence of record, as summarized at the beginning of this opinion, evinces that the child's need for medical care was apparent. Yet the appellant grossly neglected to obtain such care, partly due to her fear that her battery of the child would be discovered. (Indeed, appellant's two year old child, Mina, had been removed from her custody

for several months due to prior episodes of child abuse.) Appellant's failure to obtain medical care was not an excusable error in judgment, as the Fourth Circuit found in *Fabritz,* but a long-term avoidance, for questionable reasons, of seeking patently necessary help. We find no clear error in the trial court's finding of gross negligence. Maryland Rule 1086. Appellant may be held responsible for failing to seek medical care for Christina during her periods of lucidity.

*Judgments affirmed.*
*Costs to be paid by appellant.*