REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2781

September Term, 2015

_____

STATE OF MARYLAND

v.

LARRY DIXON

_____

Berger,
Reed,
Shaw Geter,

JJ.

_____

Opinion by Berger, J.

_____

Filed:   September 30, 2016

In this case, we consider the extent to which a circuit court may dictate the conditions of detention for an individual who is awaiting a psychological examination to determine his or her competency to stand trial and his or her criminal responsibility for the charged offenses under Maryland Code (2001, 2008 Repl. Vol., 2015 Supp.) §§3-105 and 3-111 of the Criminal Procedure ("C.P.") Article.

The State Department of Health and Mental Hygiene ("The Department"), appeals from the January 13 and January 14, 2016 orders of the Circuit Court for Baltimore City ordering the immediate transportation of Larry Dixon, appellant, for in-patient admission to Clifton T. Perkins Hospital Center ("Perkins"), the psychiatric facility where his competency and criminal responsibility evaluations would be completed. In their timely appeal, the Department questions whether the circuit court's orders violated the plain language of C.P. §§3-105 and 3-111.

Through counsel, Dixon has filed a motion to dismiss the Department's appeal, asserting that because the Department has already completed his competency evaluation, found him to be incompetent to stand trial at this time, and committed him for ongoing in-patient psychiatric care, the question presented by the Department is moot.

A case is moot when there is "no longer an existing controversy when the case comes before the Court or when there is no longer an effective remedy the Court could grant." *Suter v. Stuckey*, 402 Md. 211, 219–20 (2007) (citing, among other cases, *Dep't of Human Res. v. Roth*, 398 Md. 137, 143 (2007)). As a general rule, courts do not entertain moot controversies. *Suter*, 402 Md. at 219. There are, however, circumstances in which

this Court will address the merits of a moot case. The first is where the controversy, even though moot at the time of judicial review, "is capable of repetition but evading review." *Sanchez v. Potomac Abatement, Inc*., 198 Md. App. 436, 443 (2011). The second exception "allows us to express our views on the merits of a moot case to prevent harm to the public interest." *Id*. at 443 (footnote omitted).

Because the relevant statutes specify that competency and responsibility examinations must be completed within a certain time after they are ordered,[1] it is most unlikely that appellate review would ever be accomplished before a court-ordered examination was completed in this case or in any other. C.P. §3-105(d)(2); C.P. §3-111(c)(2). Consequently, we are persuaded that the issue presented is capable of repetition yet evading review and is, therefore, not moot.[2] The motion to dismiss is denied.

---

[1] C.P. §3-105(d)(2) requires that in cases where the defendant has not entered a plea of not criminally responsible, the Department must complete the competency evaluation and submit a report to the court within seven days after the court orders the evaluation. In cases where the court orders an examination of a defendant's criminal responsibility, C.P. §3-111(c)(2), requires the Department to complete the evaluation and submit a report to the court within sixty days. For good cause shown, the court may extend the time for an examination or order any additional examination that is necessary. C.P. §3-105(d)(2); C.P. §3-111(c)(3).

[2] Because we conclude that the issue presented in the instant appeal is one that is capable of repetition yet evading review, we need not address the public policy arguments raised by the Department in support of its argument in opposition to Dixon's motion to dismiss. We acknowledge, however, that the ability of the Department to promptly admit criminal defendants to hospitals for evaluation and treatment has recently been the focus of hearings in several circuit courts and the Maryland General Assembly, multiple media articles and commentaries, as well as the basis for a lawsuit filed against the Department in June of 2016. *See e.g.*, Bryan P. Sears, *Md. Lawmakers Vow Bill Requiring DHMH to Honor Court Orders*, The Daily Record, September 16, 2016, *available at*

# FACTUAL AND PROCEDURAL HISTORY

On the evening of July 3, 2015, the police responded to a report of a shooting at 3429 West Caton Avenue in Baltimore City. They were met by Dixon who, when asked where the injured person was, appeared to be very agitated. When one of the officers requested that Dixon calm down, Dixon responded, "How can I not be excited? I just shot someone."

Upon entering the residence, the police discovered a man (later identified as Keith Glascoe), lying on the floor in the kitchen. He had been shot in the left side. Glascoe was transported by ambulance to Shock Trauma Center, but later died as a result of his injuries. The police recovered a shotgun from a second-floor bedroom of the residence and a shotgun pellet from the kitchen floor.

Dixon was arrested and charged with first and second degree murder and first degree assault. From July of 2015 to January of 2016, Dixon was incarcerated in general population housing at the detention center. While in detention, Dixon was seen four times by a mental health clinician. Dixon reported that he was experiencing depression, anxiety,

2016 WLNR 28803928; Bryan P. Sears, *Lawmakers Assess Lack of Mental Health Services*, The Daily Record, September 11, 2016, *available at* 2016 WLNR 28030174; Editorial, *In Jail Instead of in Treatment*, The Washington Post, August 12, 2016, *available at* 2016 WLNR 24582707; Josh Hicks, *Mental-Health Experts Urge State to Hire Hospital Staff to Trim Exam Backlog*, The Washington Post, August 9, 2016, *available at* 2016 WLNR 24173826; Editorial, *The Problem with Jailing the Mentally Ill*, The Daily Record, July 13, 2016, *available at* 2016 WLNR 21882010; Dan Morse, *A Push to Help Mentally Ill in Jail*, The Washington Post, June 11, 2016, *available at* 2016 WLNR 17913606; Dan Morse, *Jails Under Stress as the Mentally Ill Wait for a Spot in Hospitals*, The Washington Post, June 9, 2016, *available at* 2016 WLNR 17443773.

and interrupted sleep and that he had stopped taking his prescribed medication. Dixon's family told Dixon's attorney that Dixon "minimized his mental health issues, was paranoid about correctional officers . . . [and] his court proceedings, and had unrealistic beliefs about the criminal justice system." Dixon's wife said that, prior to his arrest, he had become increasingly paranoid and was hearing voices.

On December 16, 2015, the circuit court entered an order requiring the Department to examine Dixon for criminal responsibility and competency to stand trial. A psychologist employed by the Department performed an initial evaluation of Dixon pursuant to the court's order. In a letter dated January 8, 2016, the Department psychologist requested an additional sixty days to allow the Department to conduct a more extensive evaluation of Dixon's competency and criminal responsibility. The Department psychologist stated that she had "made arrangements with the Pretrial Evaluation Unit of the Clifton T. Perkins Hospital Center for Mr. Dixon's further evaluation" and noted that "[d]epending on the hospital's assessment of the defendant's clinical condition and need for inpatient psychiatric care, the evaluation may be conducted on an inpatient or outpatient basis."

The circuit court considered the psychologist's letter at a hearing on January 13, 2016. As required by C.P. §3-105(d), the court found good cause to extend the time for the Department to conduct its examination of Dixon's competency to stand trial. The court also issued two orders on January 13, 2016. The first order, issued in accordance with C.P. §3-105, extended the period for Dixon's competency examination and provided, in pertinent part, "because of the apparent severity of the mental disorder . . . the Court has

found that the Defendant would be endangered by confinement in a correctional facility." The order required the Department of Public Safety and Correctional Services ("DPSCS") to immediately transport Dixon to Perkins, where he "shall be admitted as an inpatient and remain hospitalized until further order of [the] Court."

The second order, issued in accordance with C.P. §3-111, extended the period for Dixon's criminal responsibility examination and required the Department to immediately transport Dixon to Perkins. In an order signed on January 14, 2016, the court clarified that DCPSS was to transport Dixon to Perkins on "Tuesday, January 19, 2016 at 10:00 for admission and treatment[,]" and that Dixon was to remain at Perkins "until further order of this Court." The Department timely filed a notice of appeal on February 12, 2016. In a report dated April 8, 2016, the Department concluded that Dixon was not competent to stand trial.

## ANALYSIS

The Department contends that the court's orders usurped the role of the Department by dictating the timing and conditions of Dixon's confinement before, during, and after the Department's evaluations of his competency and criminal responsibility. The Department asserts that the plain language of the relevant statutes requires that, as a default, criminal defendants will be confined in a correctional facility until the Department is able to conduct the ordered competency and responsibility examinations. The Department maintains that the statutes commit to the discretion of the Department all determinations regarding when and where court-ordered examinations will be performed and grant the Department the

5

discretion to determine whether to retain a criminal defendant after he or she is examined or to return the defendant to the court or a correctional facility. The Department concludes that the circuit court overstepped its authority and violated the plain language of the relevant statutes.

"The interpretation of a statute is a question of law, which we consider *de novo*." *Harrison–Solomon v. State*, 442 Md. 254, 265 (2015)). The Court of Appeals, specifically addressing the application of Title 3 of the Criminal Procedure Article, has provided the following guidance regarding the applicable rules of statutory construction:

> The cardinal rule of statutory interpretation is to ascertain and effectuate the real and actual intent of the Legislature. A court's primary goal in interpreting statutory language is to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by the statutory provision under scrutiny.
>
> To ascertain the intent of the General Assembly, we begin with the normal, plain meaning of the statute. If the language of the statute is unambiguous and clearly consistent with the statute's apparent purpose, our inquiry as to the legislative intent ends ordinarily and we apply the statute as written without resort to other rules of construction. We neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute, and we do not construe a statute with forced or subtle interpretations that limit or extend its application.
>
> We, however, do not read statutory language in a vacuum, nor do we confine strictly our interpretation of a statute's plain language to the isolated section alone. Rather, the plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute. We presume that the Legislature intends its enactments to operate together as a consistent and harmonious body of law, and, thus,

6

we seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope. Where the words of a statute are ambiguous and subject to more than one reasonable interpretation, or where the words are clear and unambiguous when viewed in isolation, but become ambiguous when read as part of a larger statutory scheme, a court must resolve the ambiguity by searching for legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process. In resolving ambiguities, a court considers the structure of the statute, how it relates to other laws, its general purpose and relative rationality and legal effect of various competing constructions.

In every case, the statute must be given a reasonable interpretation, not one that is absurd, illogical or incompatible with common sense.

*Merchant v. State*, 448 Md. 75, 94–95 (2016) (quoting *Gardner v. State*, 420 Md. 1, 8–9 (2011) (citing, in turn, *State v. Johnson*, 415 Md. 413, 421–22 (2010))).

In this case, the court ordered that Dixon was to be examined for both his competency to stand trial and his criminal responsibility. The test for competency to stand trial and the test for criminal responsibility at the time of the commission of the offense are separate and distinct. *Jolley v. State*, 282 Md. 353, 373 (1978). *See also* C.P. §3-105 (addressing determinations of competency to stand trial); C.P. §3-111 (addressing determinations of criminal responsibility).

An individual is "not competent to stand trial" if he or she is not able "(1) to understand the nature or object of the proceeding; or (2) to assist in [his] defense." C.P. §3–101(f). Conversely, "to be competent to stand trial" means that a defendant has the "present ability to consult with his lawyer with a reasonable degree of rational understanding" and

7

a "rational as well as factual understanding of the proceedings against him." *Thanos v. State*, 330 Md. 77, 85 (1993) (internal citation omitted). It is "well established that the Due Process Clause of the Fourteenth Amendment prohibits the criminal prosecution of a defendant who is not competent to stand trial." *Medina v. California*, 505 U.S. 437, 439 (1992); *see also Trimble v. State*, 321 Md. 248, 254 (1990) ("If a state fails to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent, it denies him due process.").

With respect to criminal responsibility, C.P. §3–109 provides that "[a] defendant is not criminally responsible for criminal conduct if, at the time of that conduct, the defendant, because of a mental disorder or mental retardation, lacks substantial capacity to: (1) appreciate the criminality of that conduct; or (2) conform that conduct to the requirements of law." C.P. §3-109(a). "The purpose of [what once was called] the insanity defense is to ensure that the criminal sanction is imposed only on those who had the cognitive and volitional capacity to comply with the law." *Robey v. State*, 54 Md. App. 60, 73, *cert. denied*, 296 Md. 224 (1983) (citations omitted). "Persons whose mental disorders deprive them of this capacity are neither culpable nor deterrable, and thus 'ought not to be subject to the same penalties or treatment as are justly meted out to those who are sane.'" *Id*. (quoting *Devilbiss v. Bennett*, 70 Md. 554, 556 (1889)). "This rationale for exemption from the criminal sanction extends only to those who are mentally incapacitated during commission of the offense; only insanity at the time of the crime can excuse a defendant." *Id*.

8

The plain language of the statutes at issue in the instant case is not ambiguous. The plain language of C.P. §3-105(a)[3] provides that the court has the responsibility, in appropriate cases, to order that a competency evaluation be performed, and to "set . . . the conditions under which the examination is to be made." C.P. §3-105(a)(2). C.P. §3-105(b)[4] directs that the court is to determine whether the examination shall be conducted on an inpatient or outpatient basis. C.P. §3-105(b)(1). And C.P. §3-105(c)[5] provides that

---

[3] C.P. §3-105(a) provides:

> (a)  (1) For good cause and after giving the defendant an opportunity to be heard, the court may order the Health Department to examine the defendant to determine whether the defendant is incompetent to stand trial.
>
> (2)  The court shall set and may change the conditions under which the examination is to be made.

[4] C.P. §3-105(b) provides:

> (b)  On consideration of the nature of the charge, the court:
>
> (1)  may require or allow the examination to be done on an outpatient basis; and
>
> (2)  if an outpatient examination is authorized, shall set bail for the defendant or authorize release of the defendant on recognizance.

[5] C.P. §3-105(c) provides:

> (c)  (1)  If a defendant is to be held in custody for examination under this section, the defendant may be confined in a correctional facility until the Health Department can conduct the examination. If the court finds it appropriate for the health or safety of the

9

while "the defendant *may* be confined in a correctional facility" for the period until the Department is able to conduct the examination, C.P. §3-105(c)(1) (emphasis added), when the court determines that "because of the apparent severity of the mental disorder . . . a defendant in custody would be endangered by confinement in a correctional facility," the court may order that the Department "confine the defendant, pending examination, in a

---

> defendant, the court may order confinement in a medical wing or other isolated and secure unit of the correctional facility.
>
> (2)    (i)    If the court finds that, because of the apparent severity of the mental disorder or mental retardation, a defendant in custody would be endangered by confinement in a correctional facility, the court may order that the Health Department, in the Health Department's discretion:
>
> > 1.    confine the defendant, pending examination, in a medical facility that the Health Department designates as appropriate; or
> >
> > 2.    immediately conduct a competency examination of the defendant by a community forensic screening program or other agency that the Health Department finds appropriate.
>
> (ii)    Unless the Health Department retains the defendant, the defendant shall be promptly returned to the court after the examination.

medical facility that the Health Department designates as appropriate[.]"
C.P. §3-105(c)(2)(i)(1).

In this case, the circuit court specifically found that because of the severity of his mental disorder, Dixon's health and safety would be endangered if he was confined in a correctional facility for the period before his competency evaluation. Reports from the detention center's medical personnel indicate that, during his confinement, Dixon reported experiencing depression, anxiety, and interrupted sleep and that he had stopped taking his prescribed psychiatric medication. Dixon's family also reported to his attorney that prior to his arrest, Dixon was suffering from increased paranoia and auditory hallucinations.[6] Accordingly, we conclude that the circuit court's finding that Dixon needed to be confined in a psychiatric facility for his own safety pending his psychiatric evaluations was not clearly erroneous.

To implement its factual findings, the court ordered that Dixon be held at Perkins, which is the only secure medical facility in the State that the Department has designated to receive patients who have been accused of felonies. Indeed, Perkins was the facility expressly identified as appropriate by the Department's psychologist in her letter to the court requesting additional time to complete Dixon's evaluations. In her letter, the psychologist goes so far as to state that she had already "made arrangements with the

---

[6] During his confinement at Perkins, the medical personnel confirmed that Dixon continued to suffer from auditory hallucinations, delusions, paranoia, depression, isolation from peers, problems sleeping, and irritability, all of which he tended to deny or minimize when speaking with clinical staff.

11

Pretrial Evaluation Unit of the Clifton T. Perkins Hospital Center for Mr. Dixon's further evaluation." Thus, by specifying Perkins as the facility where Dixon should be confined prior to his evaluation, the court facilitated the implementation of the plan that had already been set in motion by the Department's psychologist.

Except for requiring that a report of the evaluation be submitted to the court within sixty days of the court's order, the court placed no other restrictions on when or how the Department was to conduct the evaluation of Dixon's competency. Thus, the order requiring the Department to conduct a competency evaluation of Dixon was fully in accordance with the plain language of C.P. §3-105.

We acknowledge that the language of C.P. §3-111(b),[7] addressing where a criminal defendant should be held pending an examination of his or her criminal responsibility, is

---

[7] C.P. §3-111(b) provides:

> (b)  (1)  If a defendant is to be held in custody for examination under this section, the defendant shall be confined in a correctional facility until the Health Department can do the examination. If the court finds it appropriate for the health or safety of the defendant, the court may order confinement:
>
> > (i)  in a medical wing or other isolated and secure unit of the correctional facility; or
> >
> > (ii)  if a medical wing or other secure unit is not available, in a medical facility that the Secretary of the Health Department designates as appropriate.

more restrictive, expressly providing that "the defendant *shall* be confined in a correctional facility" until the Department is able to do the required examination. C.P. §3-111(b)(1). The plain language of subsequent provisions of the statute, however, grants the court the discretion, when it is necessary to protect the health or safety of the defendant, to order that a defendant be confined in a "medical wing or other isolated and secure unit of the correctional facility" or, if no such facility is available, in an appropriate medical facility designated by the Department. C.P. §3-111(b)(2). The circuit court determined that such a special accommodation was necessary in the instant case.

Moreover, while the language of the court's initial order of January 13, 2016, directing that the Department was required to transport Dixon to Perkins may have violated the express requirements of the statute which provide that "a court unit" shall provide transportation to the psychological evaluation, C.P. §3-111(c)(2)(1), the court subsequently corrected that provision in the January 14, 2016 order, and required DPSCS to transport Dixon to Perkins, instead. Thus, as corrected, the court's orders did not violate the express language of C.P. §3-111.

---

(2) (i) When the Health Department can do the examination, a court unit shall take the defendant to the evaluation facility that the Health Department designates.

(ii) After the examination, unless the Health Department retains the defendant, a court unit shall return the defendant to the place of confinement.

13

In conclusion, the plain language of C.P. §3-105 and C.P. §3-111 permits the circuit court, in its discretion, to define the conditions of a defendant's incarceration necessary to protect the defendant's safety while the defendant is awaiting competency and criminal responsibility evaluations by the Department. We discern no violations of either the letter or the spirit of C.P. §3-105 and C.P. §3-111 in the circuit court's orders of January 13 and January 14, 2016, ordering Dixon's immediate transportation to the only facility designated by the Department where he could be safely confined pending his evaluation.

**MOTION TO DISMISS DENIED. JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

14