*State v. Crawford*, Nos. 1605, 1606, 1607, 1608, 1609, 1610, 1611, 1612,1613, 1798, 1799
September Term, 2017

CONSTRUCTIVE CIVIL CONTEMPT

Civil contempt proceedings are "intended to preserve and enforce the rights of private parties to a suit and to compel obedience" with court orders and decrees. *Dodson v. Dodson*, 380 Md. 438, 448 (2004) (quoting *State v. Roll and Scholl*, 267 Md. 714, 728 (1973)). "Civil contempt 'proceedings are generally remedial in nature and are intended to coerce future compliance.'" *Royal Inv. Group, LLC v. Wang*, 183 Md. App. 406, 447 (2008) (quoting *Roll*, 267 Md. at 728), *cert. granted*, 408 Md. 149 (2009), *appeal dismissed*, 409 Md. 413 (2009). Regardless of the penalty imposed in a civil contempt action, it "must provide for purging." *Dodson*, 380 Md. at 448. A purge provision offers the party "the opportunity to exonerate him or herself, that is, 'to rid him or herself of guilt and thus clear himself of the charge.'" *Jones v. State*, 351 Md. 264, 281 (1998) (quoting *Lynch v. Lynch*, 342 Md. 509, 520 (1996)).

A party generally may not be held in constructive civil contempt for delayed compliance with a court order if he or she has complied with the order prior to the contempt finding. Because the purpose of civil contempt is to coerce compliance with a court order, once the party has done what he or she was ordered to do, compliance has been achieved, and there is nothing to coerce. Holding the party in civil contempt at that point does not have the effect of coercing compliance, but rather, of punishing the party for the past failure to comply. In a case where compliance with a court order is delayed, but there is ultimate compliance prior to the contempt hearing, a court generally is limited to proceeding against the party for criminal contempt, where punishment for a past violation of a court order is permissible.

The circuit court erred in finding the Department in constructive civil contempt when, at the time of the hearing, it had complied with the court orders and admitted appellees to Department facilities.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

Nos. 1605, 1606, 1607, 1608, 1609, 1610, 1611,
1612, 1613, 1798, 1799

September Term, 2017

_____

STATE OF MARYLAND

v.

SIYYAHA CRAWFORD, ET AL.
_____

Meredith,
Graeff,
Beachley,

JJ.
_____

Opinion by Graeff, J.
_____

Filed:  October 31, 2018

*Judge Matthew J. Fader did not participate in
the Court's decision to designate this opinion for
publication pursuant to Md. Rule 8-605.1.



Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document " authentic.

Suzanne C. Johnson, Acting Clerk

In this appeal, the Maryland Department of Health ("the Department" or the "State"), appellant, challenges the order of the Circuit Court for Baltimore City finding it, and several of its officials, in constructive civil contempt.[1] The contempt findings were based on the failure to comply with court orders to admit the 11 appellees, individuals who had been charged with a crime, to a Department hospital. The court found that the Department and its officials violated: (1) orders to commit some of the appellees for inpatient competency evaluations; and (2) orders to commit appellees after a finding that they were not competent to stand trial.

On appeal, the State presents the following questions for this Court's review, which we have modified slightly as follows:

> 1. Did the circuit court err in refusing to dismiss the show cause orders as moot because all appellees had been admitted to the Department facility before the court's contempt finding on August 24, 2017, and the entry of the court's corrected order on October 4, 2017?
>
> 2. Did the circuit court err in finding the Department and five of its officials and employees in contempt when (a) all of defendants had been admitted to a Department facility before the finding of contempt; (b) the Department had no ability to comply with the commitment orders before the date of the defendants' admissions because it did not have available beds; (c) the Department did not act willfully; and (d) the orders were not sufficiently specific to support a contempt finding?
>
> 3. Did the circuit court err in imposing purging provisions that were unrelated to the underlying commitment orders and that would not have the effect of bringing the Department into compliance with those orders?
>
> 4. Did the circuit court err in entering orders that violated Article 8 of the Maryland Declaration of Rights?

---

[1] During the events at issue in this appeal, the name of the appellant agency was changed from the "Department of Health and Mental Hygiene" to the "Maryland Department of Health." Ch. 214, 2017 Laws of Maryland, effective July 1, 2017.

5. Did the circuit court err by questioning all the witnesses extensively as if the court were the prosecutor rather than a neutral decision maker?

For the reasons set forth below, we shall reverse the judgments of the circuit court.

## COMPETENCY TO STAND TRIAL

Before addressing the specifics of the case, we will briefly address the procedures governing competency evaluations and commitment orders. As the Court of Appeals recently explained:

> A criminal prosecution may not proceed against a defendant who is not competent to stand trial. For that reason, a defendant may not be continued in pretrial detention unless the government is taking steps to provide treatment to restore the defendant to competence or to have the defendant civilly committed. Maryland law provides for a trial court to determine whether a defendant is competent, is dangerous to self or others, and, if competent, has the potential to be restored to competence.

*Powell v. Md. Dep't of Health*, 455 Md. 520, 527 (2017).

A person is "not competent to stand trial" if he or she is unable "(1) to understand the nature or object of the proceeding; or (2) to assist in one's defense." Md. Code (2017 Supp.), § 3-101(f) of the Criminal Procedure Article ("CP"); *State v. Dixon*, 230 Md. App. 273, 282 (2016). When a defendant "appears . . . to be incompetent," the court "shall determine, on evidence presented on the record," whether the defendant is "incompetent to stand trial" ("IST"). CP § 3-104. To aid in this determination, a court may "order the [Department] to examine the defendant," and it "shall set . . . the conditions under which the examination is to be made." CP § 3-105(a).

A defendant may be "confined in a correctional facility until the [Department] can conduct the [competency] examination." CP § 3-105(c)(1). If, however, "the court finds

2

that, because of the apparent severity of the mental disorder . . . , a defendant in custody would be endangered by confinement in a correction facility," the court may order that the Department confine the defendant at a "medical facility that the [Department] designates as appropriate" or "immediately conduct a competency examination of the defendant by a community forensic screening program or other agency that the [Department] finds appropriate." CP § 3-105(2)(i). *See Dixon*, 230 Md. App. at 285–87 (Where a court determines that a defendant needs to be confined in a psychiatric facility for his own safety pending a competency evaluation, it may order that the Department admit the defendant to such a facility.). *Accord Powell*, 455 Md. at 529 (A trial court is "charged with determining whether a defendant is in fact incompetent to stand trial and, if so, what to do about it.").

CP § 3-106(b) governs the process for committing a defendant to a Department facility. It states, in pertinent part, as follows:

> (1) If, after a hearing, the court finds that the defendant is incompetent to stand trial and, because of mental retardation or a mental disorder, is a danger to self or the person or property of another, the court may order the defendant committed to the facility that the Health Department designates until the court finds that:
>
> > (i) the defendant no longer is incompetent to stand trial;
> >
> > (ii) the defendant no longer is, because of mental retardation or a mental disorder, a danger to self or the person or property of others; or
> >
> > (iii) there is not a substantial likelihood that the defendant will become competent to stand trial in the foreseeable future.

Thus, "the three criteria for commitment and retention of a criminal defendant in a psychiatric hospital under this provision can be understood as incompetence, dangerousness, and restorability." *Powell*, 455 Md. at 530.

Once a defendant is committed to a Department facility, the court is required to hold a hearing to determine whether the defendant continues to meet the criteria for commitment:

 (i) every year from the date of commitment;

 (ii) within 30 days after the filing of a motion by the State's Attorney or counsel for the defendant setting forth new facts or circumstances relevant to the determination; and

 (iii) within 30 days after receiving a report from the [Department] stating opinions, facts, or circumstances that have not been previously presented to the court and are relevant to the determination.

CP § 3-106(c). The Department is required to issue periodic reports on the condition of a defendant who has been committed. CP § 3-108.

As the Court of Appeals has explained, Maryland has several psychiatric hospitals. *Powell*, 455 Md. at 532; Md. Code (2017 Supp.), § 10-406 of the Health General Article ("HG"). Four of the hospitals are regional hospitals. *Id.* [2] Persons charged with serious

---

[2] Spring Grove Hospital Center receives individuals committed by courts in Baltimore City and Baltimore, Calvert, Cecil, Charles, Harford, and St. Mary's counties. Thomas B. Finan Center receives individuals committed by courts in Allegany, Frederick, Garrett, and Washington counties. Eastern Shore Hospital Center receives individuals committed by courts in Caroline, Dorchester, Kent, Queen Anne's, Somerset, Talbot, Wicomico, and Worcester counties. Springfield Hospital Center receives individuals committed by courts in Anne Arundel, Carroll, Howard, Montgomery, and Prince George's counties.

4

crimes "generally are committed to Clifton T. Perkins Hospital Center ("Perkins"), regardless of the location of the court that ordered the commitment." *Id.*

With this background in mind, we turn to the specific facts and issues presented in this case.

## FACTUAL AND PROCEDURAL BACKGROUND

The contempt findings at issue here were based on orders relating to each of the 11 appellees. The circuit court ordered that appellees be committed to the Department: (1) for a competency evaluation; or (2) based on a finding that the defendant was IST and dangerous to self or another.[3] We summarize below the orders for each appellee.

## I.

## Individual Commitment Orders

Siyyaha Crawford was charged with first degree arson, second degree malicious burning, and second degree assault. On April 5, 2017, the court, finding good cause to

---

*Powell v. Md. Dep't of Health*, 455 Md. 520, 532 n.7 (2017).

[3] On December 13, 2017, this Court consolidated the case of *State of Maryland v. Siyahha Crawford*, No. 1611, Sept. Term 2017 with *State of Maryland v. Brian Johns*, No. 1605, Sept. Term, 2017*; State of Maryland v. Ronald Meddings*, No. 1606, Sept. Term, 2017; *State of Maryland v. Ronald Merriken*, No. 1607, Sept. Term, 2017; State *of Maryland v. Walter Randle*, No. 1608, Sept. Term 2017; *State of Maryland v. Tony Wardlow*, No. 1609, Sept. Term, 2017; *State of Maryland v. Lamont Knight*, No. 1610, Sept. Term, 2017; *State of Maryland v. Corey Carroll*, No. 1612, Sept. Term, 2017; *State of Maryland v. Darnell Hines*, No. 1613, Sept. Term, 2017; *State of Maryland v. Zionnes Spencer*, No. 1798, Sept. Term, 2017; *State of Maryland v. Santee Taylor*, No. 1799, Sept. Term, 2017.

believe that Mr. Crawford might be IST, ordered him committed to the Department for a competency examination, providing that he be confined at the Department of Public Safety and Correctional Services ("DPSCS"), and be seen by the Circuit Court Medical Office ("CCMO").[4] On April 19, 2017, based on the preliminary report it received, the court ordered that the commitment to the Department be continued, and based on a finding that Mr. Crawford would be endangered by confinement in a correctional facility, it ordered that DPSCS transport Mr. Crawford to a facility of the Department's choice on April 24, 2017, for an inpatient competency evaluation.

On April 26, 2017, the court issued an order stating that, because Mr. Crawford had been found incompetent to stand trial ("IST") and dangerous, he be committed to the Department for confinement until he was no longer IST.[5] It further ordered that, "upon receipt of the order," DPSCS transport Mr. Crawford immediately to Perkins or "such other facility" designated by the Department. Mr. Crawford was not admitted to a Department hospital until June 29, 2017.

Walter Randle was charged with robbery with a dangerous weapon, wearing and carrying a dangerous weapon, robbery, and theft. On May 24, 2017, the circuit court found

---

[4] As discussed *infra*, when the issue of a defendant's competency has been raised, a District Court or circuit court judge typically will order that a community evaluator, i.e., the Circuit Court Medical Office ("CCMO"), render an opinion on the issue.

[5] The court stated in its contempt order that "Perkins failed to admit defendant," and it then found Mr. Crawford incompetent to stand trial ("IST") based on notes from the CCMO.

Mr. Randle to be IST and a danger. The court ordered that Mr. Randle be committed to the Department, and that, upon receipt of the order, DPSCS transport him immediately to Perkins or another facility the Department designated. He was not admitted until June 28, 2017.[6]

Corey Carroll was charged with attempted murder and related offenses. On May 10, 2017, the circuit court ordered that the CCMO conduct a competency evaluation of Mr. Carroll. On May 24, 2017, based on the report of the CCMO, the court ordered that the Department conduct an extended, inpatient competency evaluation of Mr. Carroll at Perkins or "such other facility" designated by the Department. It further ordered that DPSCS "shall immediately transport" Mr. Carroll to Perkins. The Department failed to admit Mr. Carroll, and on May 31, 2017, the court issued an order stating that, because Mr. Carroll had been found IST and dangerous, he be committed to the Department for confinement until he was no longer IST. It further ordered that, "upon receipt of the order," DPSCS transport Mr. Carroll immediately to Perkins. He was not admitted until July 24, 2017.

Ronald Merriken was charged with robbery, second degree assault, and theft. On May 31, 2017, the court found Mr. Merriken to be IST and dangerous and committed him to the Department. It ordered DPSCS, on receipt of the order, to transport Mr. Merriken immediately to Spring Grove. He was not admitted until August 2, 2017.

---

[6] The dates of admission for Mr. Randle and for some of the other appellees are taken from the circuit court's order. Appellant has not disputed these dates. The court stated in its contempt order that Mr. Randle had been committed as incompetent in 2015, restored to competency, and returned to jail, but again committed as incompetent in 2017.

Brian Johns was charged with second degree murder and related offenses. On May 3, 2017, the court found good cause to believe that Mr. Johns may be IST, ordered him committed to the Department for a competency examination, and provided that he be confined at DPSCS and seen by CCMO. On May 17, 2017, based on the preliminary report it received, the court ordered that the commitment to the Department be continued and the Department commit Mr. Johns to a facility of its choice on May 22, 2017, for an inpatient competency evaluation. On May 31, 2017, the court issued an order stating that, because Mr. Johns had been found IST and dangerous, he be committed to the Department for confinement until he was no longer IST. It further ordered that, "upon receipt of the order," DPSCS transport Mr. Johns immediately to Perkins or "such other facility" designated by the Department. Mr. Johns was not admitted to a psychiatric facility until July 5, 2017.

Darnell Hines was charged with child abuse, second degree assault, and reckless endangerment. On May 10, 2017, the court found good cause to believe Mr. Hines may be IST, and it ordered that he be confined at Baltimore County Detention Center ("BCDC") and that the BCDC transport him to the Department for a competency examination. On May 31, 2017, the court issued an order stating that, because Mr. Hines had been found IST and dangerous, he be committed to the Department for confinement until he was no longer IST. It further ordered that, "upon receipt of the order," DPSCS transport Mr. Hines immediately to Spring Grove or "such other facility" designated by the Department. Mr. Hines was not admitted until July 30, 2017.

Lamont Knight was charged with assault, reckless endangerment, and wearing and carrying a dangerous weapon. On May 24, 2017, the circuit court ordered that the CCMO

8

conduct an initial competency evaluation of Mr. Knight. On May 31, 2017, the circuit court found him IST, committed him to the Department, and ordered that DPSCS, upon receipt of the order, transport him to Spring Grove or "such other facility" designated by the Department. He was not admitted until July 30, 2017.

Tony Wardlow was charged with robbery with a dangerous weapon, assault, and related offenses. On May 25, 2017, the court found good cause to believe Mr. Wardlow might be IST, and it ordered him committed to the Department for a competency examination, providing that he be confined at DPSCS and seen by CCMO.[7] On June 7, 2017, based on the preliminary report it received, the court ordered that the commitment to the Department be continued, and that DPSCS transport Mr. Wardlow immediately to Perkins on June 12, 2017, for an inpatient competency evaluation. On June 21, 2017, the court issued an order stating that, because Mr. Wardlow had been found IST and dangerous, he be committed to the Department for confinement until he was no longer IST or a danger to self or others. It further ordered that, upon receipt of the order, DPSCS transport Mr. Wardlow immediately to Perkins or "such other facility" designated by the Department. He was not admitted to Perkins until July 21, 2017.

Ronald Meddings, on May 31, 2017, was charged with first and second degree assault. On June 7, the District Court for Baltimore City ordered that Mr. Meddings be

---

[7] The circuit court's contempt order states that Mr. Wardlow previously had been found IST, committed to the Department, subsequently found to be competent, and returned to jail. The record indicates that the May 2017 order for an examination was triggered by reports that Mr. Wardlow was not being medicated while being held pre-trial and was experiencing hallucinations.

evaluated by CCMO. On June 15, the District Court ordered that Mr. Meddings undergo an inpatient competency evaluation at a Department facility. On June 21, 2017, Mr. Meddings was indicted in the Circuit Court for Baltimore City for offenses that included first and second degree attempted murder. On June 28, 2017, the circuit court issued an order stating that, because Mr. Meddings had been found IST and dangerous, he be committed to the Department for confinement until he was no longer IST and dangerous. It further ordered that, upon receipt of the order, DPSCS transport Mr. Meddings immediately to Perkins or "such other facility" designated by the Department. On July 1, 2017, he was admitted to Bon Secours hospital. On July 18, 2017, after discharge from Bon Secours Hospital, Mr. Meddings was admitted to Spring Grove, and on August 7, 2017, he was transferred to Perkins.

Zionnes Spencer was charged with armed carjacking and related offenses. On July 12, 2017, after the court ordered a competency evaluation and the CCMO requested an evaluation at Perkins, the court ordered that Mr. Spencer's commitment to the Department be extended and DPSCS transport him to Perkins on July 17, 2017, for an inpatient competency evaluation. Mr. Spencer was not admitted until August 4, 2017.

Santee Taylor was charged with attempted murder and related offenses. On July 12, 2017, after the CCMO requested an evaluation at Perkins, the court ordered that Mr. Taylor's commitment to the Department be extended and that DPSCS transport Mr. Taylor to Perkins on July 17, 2017, for a competency evaluation. Mr. Taylor was not admitted until August 8, 2017.

## Show Cause Orders

In June 2017, nine of the appellees who had been found IST and committed to the Department for confinement filed a petition requesting that the court issue orders to the Department and its officials to show cause why they should not be found in constructive civil contempt for failing to comply with the court's orders that they be transported and admitted to a hospital.[8] The court granted the petitions in a series of show cause orders that it issued in June and July 2017. The initial show cause orders, signed on June 7-8 and July 6, 2017, ordered the Department to answer the petitions.[9]

On July 12, 2017, the court issued additional show cause orders in these cases. Six of the show cause orders directed Dennis R. Schrader, Secretary of the Department; Barbara J. Bazron, Ph.D, Deputy Secretary of the Department; Erik Roskes, M.D., Director of Office of Forensic Services, Behavioral Health Administration ("BHA"); Kim Bright, M.D., Clinical Director, BHA; Inna Taller, M.D., Clinical Director, Perkins; Danielle Robinson, M.D., Clinical Director, Pretrial Services, Perkins, to show cause why they should not be held in contempt for failure to comply with commitment orders relating to

---

[8] The nine appellees are Walter Randle, Brian Johns, Darnell Hines, Ronald Meddings, Ronald Merriken, Corey Carroll, Lamont Knight, Siyyaha Crawford, and Tony Wardlow.

[9] The court granted the petition of Mr. Randle and Mr. Knight on June 7, 2017. It granted the petitions of Mr. Crawford, Mr. Carroll, Mr. Hines, Mr. Johns, and Mr. Merricken on June 8, 2017. It granted the petitions of Mr. Wardlow and Mr. Meddings, on July 6, 2017.

appellees Crawford, Carroll, Randle, Wardlow, Meddings, and Johns.[10] Three of the show cause orders directed Secretary Schrader; Deputy Secretary Bazron; Dr. Roskes; Dr. Bright; Elizabeth Tomar, M.D., Clinical Director, Spring Grove; and Bevin Merles, Ph.D., Forensic Office, Spring Grove, to show cause why they should not be held in contempt for failure to comply with commitment orders relating to appellees Hines, Knight, and Merriken.

On July 25, 2017, the circuit court issued two more show cause orders, directing Secretary Schrader, Deputy Secretary Bazron, Dr. Roskes, Dr. Bright, Dr. Taller, and Dr. Robinson, to show cause why they should not be held in contempt for failing to comply with an order for commitment for evaluation as to competency to stand trial relating to appellees Spencer and Taylor.

In response, the State argued that the show cause orders should be dismissed. In support, it asserted that, at the time of the response, the appellees had been committed to a psychiatric hospital, and therefore, the issue was moot, or alternatively, any contempt had been purged. Additionally, the State argued that: (1) the Department could not be found in contempt because there were no beds available at the state health facilities at the time the orders were issued, and therefore, it lacked the ability to comply with the orders; (2) the

---

[10] All of the show cause orders addressed the failure to comply with the order of commitment after a finding of IST, pursuant to CP § 3-106(b), and the show cause orders relating to appellees Crawford, Carroll, and Wardlow also directed the officers to show cause why they should not be held in contempt for failing to comply with the order of commitment for evaluation pursuant to Md. Code (2017 Supp.), § 3-105 of the Criminal Procedure Article ("CP").

12

Department did not willfully violate the court orders; and (3) the show cause orders were "not sufficiently specific to support a contempt finding."

The State subsequently filed an addendum response. It asserted that "a court's contempt power may not be used to require compliance with an unenforceable order," and the commitment order requiring the Department to admit an individual "immediately" was not within the authority of the court, and therefore, it was unenforceable. The State further argued that "at the hearing on the show cause orders, evidence must be limited to the circumstances of the specific defendants, and not be permitted to encompass the administration of the State's mental health services, including the State hospitals."

## III.

### Show Cause Hearings

The court held a hearing on the show cause orders during the course of nine days between July 25 and September 28, 2017. During those hearings, several witnesses testified regarding: (1) the facilities at Perkins; (2) the facilities at Spring Grove; (3) the Department's competency evaluation policy; (4) the Department's admissions policy; and (5) the actions the Department had taken to attempt to solve capacity issues it had experienced at the hospitals.[11] We will briefly summarize the testimony elicited.

---

[11] The circuit court stated in its order that Perkins was the "only officially designated forensic hospital" in Maryland, but the Department had beds at "four regional hospitals – Spring Grove, Springfield, Finan Center, and Eastern Shore State Hospital." It stated that "the vast majority of patients in the regional hospitals are forensic patients, [i.e., patients] committed by the courts in criminal cases as incompetent or not criminally responsible." The appellees in this case were committed to either Perkins or Spring Grove.

A.

Perkins

Perkins is a maximum-security hospital reserved for patients who have committed violent felonies. At the time of the July 25, 2017, hearing date, it had a budget for 250 beds, but it had 260 patients, "10 over census."[12]

The hospital contained two maximum security admissions units: One West and Three South. One West had approximately 19 beds to house male patients, and Three South had 22 beds to house female patients. Another unit, One East, had approximately 26 beds. Dr. Lawrence Brown testified that the medical unit had 26 beds, and Dr. Taller testified that it had 28. It was reserved for male patients, and occasionally, it was used as an admissions unit for medically compromised patients. There were two medium security units for males, one with 24 beds and the other with 29. There also were two minimum security units in the North Wing, each with approximately 20 beds.

On April 10, 2017, Perkins opened a 20-bed "step-down unit" that was staffed for 12 patients who were "on the cusp of discharge," i.e., waiting for community placement or court approval for conditional release.[13] Five patients had been discharged from the unit

---

[12] Mr. John Robison, CEO of Perkins, testified that Perkins was licensed for 298 beds, but the budget was for 250. To maintain beds that were over-budget, Perkins had authorized significant amounts of overtime for its existing staff. In 2016, the hospital approved 198,000 hours of overtime, which was approximately $6.8 million in pay.

[13] The step-down unit could hold a maximum of 20 people, but as of July 25, 2017, it was staffed only for 10 beds.

since its opening and three were nearing discharge.[14]  John Robison, the CEO of Perkins, testified that he considered filling the remainder of the eight beds with medium-security patients, which he considered a "less risky" option than opening a new admissions unit.

The creation of the step-down unit had no direct effect on the admission of new patients.  It took "four steps" for the addition of beds at the step-down unit to affect the discharge of people in the maximum security unit: (1) someone from a minimum security unit is moved to the step-down unit; (2) someone from medium security unit is moved to a minimum security unit; (3) someone from  a maximum security unit is moved to a medium security unit; and (4) a court-committed defendant takes the bed of the person leaving the maximum security unit.

There was another unit at Three North, but it was vacant.  It previously had been under the control of the Developmental Disability Administration until it left the facility in November 2016.  Mr. Robison testified that the unit was undergoing renovations, and he anticipated it would be furnished in September 2017, housing medium security patients. Although there had not been discussion about changing this unit into an admissions unit, Mr. Robison testified that the opening of the unit would allow Perkins staff to use an existing medium-security unit as an admissions unit.

---

[14] As of July 25, 2017, there were no patients ready to be moved to the unit.

B.

Spring Grove

At the time of the hearing, Spring Grove housed approximately 342 patients, 80% of whom were forensic.[15] Patients who were medically unstable or required more medical monitoring usually were sent to Spring Grove, which was better equipped to handle those cases. The hospital had a large geriatric population.

There were four admissions units at the hospital. Three had approximately 25 beds, and one, which was reserved for female patients, had approximately 10 beds. There were four long-term care units at Spring Grove, which each housed between 31-41 patients on a given day.

Dr. Tomar testified that the hospital was understaffed. Andrea Braid, the CEO of Spring Grove, testified that, in 2016, the hospital spent $5 million in overtime. She explained that the staffing at Spring Grove was at its "minimum," and there were 40 vacancies, due to budgetary reductions across the board.[16] Ms. Braid attributed staffing problems to the low salaries offered at Spring Grove and the security risks at the hospital.

---

[15] As indicated, the circuit court stated that "forensic" patients referred to people who were facing criminal charges and committed as IST or not criminally responsible.

[16] Ms. Braid testified that she did not request additional funding because it was her understanding "that what we're given is what we're given and that's all we can have."

16

On May 31, 2017, the date that the court issued orders to admit Mr. Merriken, Mr. Knight, and Mr. Hines, there were 30 people on the waitlist at Spring Grove.[17]

C.

Competency Evaluation Policy

The Department presented evidence that it had implemented procedures for conducting competency evaluations, which varied based on the severity of the crime with which a defendant was charged and whether the District Court or a circuit court ordered the evaluation. When the issue of a defendant's competency has been raised, a District Court or circuit court judge typically will order that a community evaluator, i.e., CCMO, render an opinion on the issue. In the case of a defendant charged with a Perkins level offense, a serious charge, the CCMO can find that the defendant is competent, but it is the Department's policy that CCMO cannot find someone IST. For defendants who have committed "Spring Grove level" offenses, whether community evaluators can make definitive evaluations of incompetency depends on the court that ordered the competency evaluation. If the District Court ordered the evaluation, the community evaluator can make a definitive finding as to the competency of a defendant, but if the evaluator believes the defendant is incompetent, he or she does not make such a finding but requests further evaluation at Spring Grove. If the circuit court orders an evaluation, however, the

---

[17] Fourteen individuals on the list had been adjudicated incompetent, four were ordered admitted under hospital warrants, two were ordered to undergo forensic evaluations, and ten were referred for admission from community hospitals.

17

community evaluator can state his or her finding that the defendant is competent or incompetent.

Dr. Roskes stated that the rationale for not allowing CCMO to make a finding of incompetency in a Perkins-level offense is to maintain flexibility because a bed at Perkins is a "very valuable and limited resource." Given the limited number of beds, the Department needed to make the "clinical judgments about who requires admission and who doesn't." Dr. Roskes further explained that Perkins level cases generally are more complicated, and the evaluation often takes more time.

D.

Admissions Policy

Perkins and Spring Grove can admit patients only when there are available beds. Lawrence Brown, the admissions coordinator at Perkins, testified that he received the transportation orders by email, within one to two days. If Perkins does not have a bed, he contacts the detention center and the court to so advise.[18] In response to a question whether the Department was required to admit someone upon receipt of a court order, Dr. Robinson responded: "Yes, if we're able to."[19]

---

[18] Mr. Brown testified that Dr. Roskes and Dr. Bazron provided him with a form letter that he would use to contact the court.

[19] Counsel for appellees asked Dr. Robinson if she knew of any authority she had to tell the Department of Public Safety and Correctional Services ("DPSCS") to "bring a person back when they have a valid court order," and she responded: "No, but I also don't have any authority to admit someone when there is no bed available."

18

The Department prioritizes admissions based on bed and staffing availability. It considers the patient's legal status and clinical acuity, as follows:

1. <u>First priority</u>: Conditionally released patients referred voluntarily or pursuant to a hospital warrant [Criminal Procedure § 3-121(e)(1)].

2. <u>Second priority</u>: Patients committed as incompetent to stand trial and dangerous (ISTD) due to mental disorder or mental retardation [Crim Proc § 3-106(b)] or as not criminally responsible [Crim Proc § 3-112], including pretrial released patients referred pursuant to a retake warrant.

3. <u>Third priority</u>: Patients certified for admission from jail; mandatory releases from DPSCS.

4. <u>Fourth priority</u>: Patients referred to the Department for evaluation as to their competency to stand trial (Criminal Procedure § 3-105), criminal responsibility (Criminal Procedure § 3-111), or a juvenile court order for evaluation and/or disposition (Courts and Judicial Proceedings § 3-816, § 3-819, § 3-8A-17, § 3-8A-17.2, § 3-8A-19, Maryland Rule 11-115).

5. <u>Fifth Priority</u>: Patients without court involvement who are referred for transfer from another state psychiatric hospital, a DDA facility, or a community/general hospital.

Dr. Roskes testified that the priorities attempt to get the "sickest folks" and "the most legally urgent" people in first.

Although patients generally are admitted when they become current on the waitlist, they can move to the top of the list if they are granted a clinical override. Clinicians at each regional hospital are charged with determining whether an override is warranted.[20] In determining whether an override is appropriate, psychiatrists look at several factors,

---

[20] Mr. Brown testified that it was his duty to call the detention centers where court-ordered defendants were housed to determine their physical and psychiatric state. He would then relay that information to Dr. Taller and Dr. Robinson, who would decide a patient's level of clinical acuity.

including whether a patient: (1) is eating or drinking; (2) has engaged in physical altercations; (3) is able to follow directions; (4) is taking their medications; (5) is having significant medical problems; and (6) can be safely managed. The main criterion for deciding whether to grant a clinical override is whether the patient is a danger to themselves. The mere fact that a patient may be psychotic is not enough to justify the clinical override. Between May 1 and July 25, 2017, there were approximately three to five patients who "jumped" the waitlist due to their clinical acuity and were admitted promptly for treatment.

Once a patient has been admitted, he or she can be transferred to a residential unit for longer-term care. There needs to be an available bed in the residential unit, however, and there often are difficulties discharging people from a residential bed due to court delays in their cases and treatment placement for patients.

E.

Actions Taken to Solve Capacity Issues

The Department detailed steps it had taken to reduce the waitlists at its regional hospitals. In addition to creating the step-down unit at Perkins, the Department had contacted other hospitals and programs to open up beds, and it had plans to renovate a unit at Eastern Shore Hospital to accommodate 24 additional patients. Dr. Bazron testified that the unit was expected to be opened "180 days" from August 15, 2017.

The Department also was making efforts to create a data system for the entire behavioral health system. Dr. Roskes testified that the waitlists were "chaotic," in part, because there was no centralized database for monitoring bed availability across hospitals.

20

He testified that, under the system in place at the time, court orders often were ranked based on which judge "yelled the loudest."

## IV.

## Contempt Orders

On August 24, 2017, the court issued an oral ruling from the bench. The court acknowledged that, at that point, after the issuance of the show cause orders, all of the appellees had been admitted to the hospital. The court stated, however, that the Department had adopted policies "limit[ing] the numbers of beds available for the admission of court-ordered individuals," and that the problem was "likely to reoccur." It found that the Department had "willfully and intentionally violated the Court's order," and it was "highly likely [it would] continue to do so." Rather than issue a final judgment of contempt, however, it postponed the case for at least 30 days, at which time it would hear from the Department on efforts to address the problem of admissions. The court then heard testimony regarding "the show causes against the individuals."

On October 4, 2017, the court issued a Corrected Order of Constructive Civil Contempt: Findings With Purge Provisions.[21] The court found that the Department and five of its individual officers "willfully, intentionally, and voluntarily violated" the court's orders. In so finding, the court stated that each of the court's orders, for inpatient competency evaluation or to commit based on a finding of IST, "dictated a date for

---

[21] The court initially issued an order on September 28, 2017, but it issued a corrected order, the order at issue on appeal, on October 4, 2017.

21

admission," and "[a]ll admissions were after the dates ordered by the court" and all of the appellees "were held in pre-trial status in correctional facilities." The court devoted 12 pages to a discussion of the crisis in admissions at Maryland's psychiatric hospitals, and it detailed the policies and practices of the Department that the court believed contributed to the continued waitlist for beds.[22]

In finding the Department in contempt, the court found that, although there may have been no available bed for any of the appellees "at the time the show cause orders were issued and the contempt hearings commenced, the lack of beds is directly attributable to the actions, inactions, and omissions of the Department." In particular, the court noted that, instead of opening a new 20-bed admission unit at Perkins, as recommended and promised, Dr. Bazron decided to open a step-down unit, which was less costly but did not "solve the problem of admission delays." The court found that the "Department's conduct in failing to solve the problem of admissions delay [was] driven by budgetary concerns." It stated that the delay in competency evaluation or commitment deprived appellees, pretrial detainees who had not been convicted of a crime, of their liberty interest in "'freedom from incarceration and [also] in restorative treatment.'" (quoting *Oregon Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1121 (9th Cir. 2003)).

---

[22] These practices and policies included: (1) the Department's policy of preventing the CCMO from making a definitive finding of incompetency for patients who have been charged in a District Court or patients who have been charged in the circuit court with Perkins level offenses; (2) the Department's admissions policy; and (3) the failure of the Department to monitor the clinical acuity of defendants who were on waitlists for admission to its hospitals.

22

The court then ordered the Department and its officials to take remedial actions, stating that it issued purge provisions "intended to eliminate the unjustifiable delay in admissions of defendants to the Department's hospitals." These purge provisions provided, among other things, that the Department and Secretary Schrader take the following actions:

1. "[F]ully staff and admit patients to the [20]-bed unit opened at [Perkins] on April 10, 2017, with a patient mix to be determined by the CEO";

2. By December 31, 2017, open and staff a "new" 20-bed admissions unit at Perkins;

3. By December 31, 2017, open and staff a "new" 20-bed admissions unit at Spring Grove; and

4. Obey all commitment orders issued by the court "by admitting defendants committed to Department facilities in accordance with the terms of the [court orders], including the dates of admission."

This appeal followed. On December 6, 2017, the court granted the State's motion to stay execution of the Corrected Order pending the resolution of the matter on appeal.

## DISCUSSION

The State asserts multiple grounds of error by the circuit court in finding the Department and its officials in constructive civil contempt. Before addressing these specific claims, we will discuss generally the law regarding contempt.

In *Bradford v. State*, 199 Md. App. 175, 193 (2011), this Court explained that "the universe of contempt proceedings is divided into four quadrants: direct and constructive contempt; and criminal and civil contempt." Direct contempt occurs when the contempt is "committed in the presence of the judge presiding in court or so near to the judge as to interrupt the court's proceedings." Rule 15-202(b). Direct contempts may be summarily

23

punished to protect the orderly administration of justice and vindicate the dignity of the court. *Smith v. State*, 382 Md. 329, 338 (2004); *Espinosa v. State*, 198 Md. App. 354, 387 (2011).

"'Constructive contempt' means any contempt other than a direct contempt." Rule 15-202(a). In constructive contempt proceedings, the accused contemnor must have "an opportunity to challenge the alleged contempt and show cause why a finding of contempt should not be entered." *Fisher v. McCrary Crescent City, LLC*, 186 Md. App. 86, 119 (2009), *cert. denied*, 562 U.S. 1060 (2010).

Civil contempt proceedings are "intended to preserve and enforce the rights of private parties to a suit and to compel obedience" with court orders and decrees. *Dodson v. Dodson*, 380 Md. 438, 448 (2004) (quoting *State v. Roll and Scholl*, 267 Md. 714, 728 (1973)). "Civil contempt 'proceedings are generally remedial in nature and are intended to coerce future compliance.'" *Royal Inv. Group, LLC v. Wang*, 183 Md. App. 406, 447 (2008) (quoting *Roll*, 267 Md. at 728), *cert. granted*, 408 Md. 149 (2009), *appeal dismissed*, 409 Md. 413 (2009). Regardless of the penalty imposed in a civil contempt action, it "must provide for purging." *Dodson*, 380 Md. at 448. A purge provision offers the party "the opportunity to exonerate him or herself, that is, 'to rid him or herself of guilt and thus clear himself of the charge.'" *Jones v. State*, 351 Md. 264, 281 (1998) (quoting *Lynch v. Lynch*, 342 Md. 509, 520 (1996)).

Criminal contempt proceedings, in contrast, are intended to "'punish for past misconduct, which may no longer be capable of remedy.'" *Bradford*, 199 Md. App. at 193 (quoting *Arrington v. Dep't of Human Res.*, 402 Md. 79, 93 (2007). The sanctions in these

proceedings are "punitive in nature," and therefore, they do not require a purging provision. *Id.* at 194 (quoting *Arrington*, 402 Md at 83). Unlike civil contempt, which generally must be proved by a preponderance of the evidence, the burden of proof in criminal contempt proceedings is beyond a reasonable doubt.[23] *Gertz v. Md. Dep't of Env't*, 199 Md. App. 413, 423, *cert. denied*, 423 Md. 451 (2011).

Additionally, as this Court has explained,

> "Before a party may be held in contempt of a court order, the order must be sufficiently definite, certain, and specific in its terms so that the party may understand precisely what conduct the order requires." *Droney v. Droney*, 102 Md. App. 672, 684, 651 A.2d 415 (1995). Moreover, "one may not be held in contempt of a court order unless the failure to comply with the court order was or is willful." *Dodson*, 380 Md. at 452, 845 A.2d 1194.

*Royal*, 183 Md. App. at 447–48. "[A] negligent failure to comply with a court order is simply not contemptuous in a legal sense." *Dodson*, 380 Md. at 452.

The decision to hold a party in contempt is vested in the trial court, and this Court generally will reverse such a decision only "'upon a showing that a finding of fact upon which the contempt was imposed was clearly erroneous or that the court abused its discretion.'" *Gertz*, 199 Md. App. at 424 (quoting *Royal*, 183 Md. App. at 448). Where, however, "the order involves an interpretation and application of statutory and case law, we must determine whether the circuit court's conclusions are 'legally correct' under a *de novo* standard of review." *Kowalczyk v. Bresler*, 231 Md. App. 203, 209 (2016).

---

[23] Maryland Rule 15-207(e)(2) sets forth an exception to the rule that civil contempt must be proved by a preponderance of the evidence. When the constructive civil contempt proceeding is to enforce a spousal or child support order, the burden of proof is "clear and convincing evidence that the alleged contemnor has not paid the amount owed." *Id.*

25

With this background in mind, we turn to the State's contentions of error.

## I.

## Mootness

The State initially contends that the circuit court erred in "refusing to dismiss the show cause orders as moot." It notes that, prior to the first contempt finding on August 24, 2017, and two months before the court issued the Corrected Order, appellees had "obtained the entirety of the relief they sought in the circuit court—admission to a Department hospital."[24] The State argues, therefore, that at the time of the contempt finding, "there was no longer a controversy before the circuit court regarding the Department's alleged failure to comply with the circuit court's orders, and there was no remedy that the circuit court could grant the individual defendants who were the subject of the underlying commitment orders." Accordingly, it contends that the court should have dismissed the proceedings as moot.

Appellees argue that the show cause orders were not moot because, although they all had been admitted to a Department hospital prior to the contempt finding, there are two exceptions to a finding of mootness, both of which applied here. First, appellees argue that the circuit court properly found that the issue was "capable of repetition, yet evading review." They assert that the admission delays they experienced were "too brief a time to

---

[24] The last appellee to be admitted to a state hospital, Santee Taylor, was admitted to Perkins on August 8, 2017. Although this was approximately three weeks past the time the court ordered him to be transported to Perkins, Mr. Taylor was admitted prior to the court's first finding of constructive civil contempt.

26

fully litigate the controversy arising from those delays," and they may reasonably be subjected to similar orders in the future.  Second, appellees argue that the case qualifies for the "public interest exception" to the mootness doctrine.

A case is deemed moot when "there is no longer an existing controversy between the parties, so that there is no longer any effective remedy which the court can provide." *Powell*, 455 Md. at 539 (quoting *Mercy Hosp., Inc. v. Jackson*, 306 Md. 556, 561 (1986)). Courts generally do not address moot controversies.  *Dixon*, 230 Md. App. at 277.

Here, as the State asserts, and appellees do not dispute, prior to the time the circuit court issued its contempt order, all of the appellees had been admitted to Perkins or Spring Grove.  Thus, they obtained the relief that they sought, i.e., admission to a Department hospital, and there was no longer a controversy between the parties.

As appellees note, however, there are exceptions to the mootness doctrine.  First, this Court may address the merits of a moot case if the controversy is "'capable of repetition but evading review.'"  *Id.* at 277 (quoting *Sanchez v. Potomac Abatement, Inc.*, 198 Md. App. 436, 443 (2011)).  "This exception applies when '(1) the challenged action was too short in its duration to be fully litigated prior to its cessation or expiration; and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again.'"  *Powell*, 455 Md. at 541 (quoting *State v. Parker*, 334 Md. 576, 585–86 (1994)).

Second, courts may review an otherwise moot controversy "if the issue is of public importance and affects an identifiable group for whom the complaining party is an appropriate surrogate."  *Id.*  As the Court of Appeals has explained:

27

> [I]f a matter's "recurrence will involve a relationship between government and its citizens, or a duty of government, and upon any recurrence, the same difficulty which prevented the appeal at hand from being heard in time is likely again to prevent a decision, then [the] Court may find justification for deciding the issues raised by a question which has become moot, particularly if all these factors concur with sufficient weight."

*La Valle v. La Valle*, 432 Md. 343, 352 (2013) (quoting *Lloyd v. Bd. of Supervisors of Balt. Cty.*, 206 Md. 36, 43 (1954)).

The Maryland appellate courts recently have addressed challenges involving a court order relating to a criminal defendant's incompetency to stand trial and held that they were capable of repetition yet evading review. *Powell*, 455 Md. at 540–41; *Dixon*, 230 Md. App. at 276–78. In *Powell*, 455 Md. at 540–41, the Court of Appeals addressed a challenge by defendants found IST, but not admitted to Perkins by the deadline specified by the court, that the delay violated CP § 3-106(b) and their right to due process. The Court noted that the delays in that case, which ranged from 12 to 36 days, were "too short in duration to be fully litigated prior to its cessation." *Id.* at 541. And because it was possible that one of the complaining parties would be subject to the same circumstances again, it was a "classic example" of the exception to the mootness doctrine where the controversy between the parties was "capable of repetition but evading review." *Id.* at 540–41.

In *Dixon*, 230 Md. App. at 276, this Court was presented with an issue regarding the validity of a court order directing the Department to immediately transport a defendant to Perkins for a competency evaluation. In determining that the Department's belated compliance with the order did not render the issue moot, we stated that the issue was "capable of repetition but evading review" because the "relevant statutes specify that

28

competency and responsibility examinations must be completed" within a short period of time, and it was "most unlikely that appellate review would ever be accomplished before a court-ordered examination was completed." *Id.* at 277–78.

Here, the circuit court relied on these cases in concluding that the matter was not moot. The court stated:

> The *Powell* Court found that "the failure to admit the Appellant to Perkins – was too short in duration to be fully litigated prior to its cessation. It is also entirely possible that the complaining party – one of the Appellants –would be subject to the same circumstances again." *Id.* at 18. *It is significant that the Appellants in this appeal were the defendants who were the subjects of last year's contempt hearings.* The fact that one year later this Court is faced with another group of incompetent defendants who languished in jail awaiting admission to the Department's hospitals proves the point that this situation is not only capable of repetition. Indeed, it repeats itself with additional defendants. Moreover, the possibility of a particular defendant being exposed to multiple delays of admission because of recurrent periods of incompetence exists among the defendants before this Court, particularly with those who have periods of medication noncompliance, such as Mr. Meddings.

The circuit court further noted that two appellees, Mr. Randle and Mr. Wardlow, previously had "been committed as incompetent and dangerous and restored to competency," but they "subsequently decompensated in the jail" and "returned to Perkins after being adjudicated incompetent and dangerous." The court stated that, "among this group . . . are precisely the circumstances envisioned by Judge McDonald in his *Powell* opinion." The court concluded that "the issue of delay in hospital admission [is] capable of repetition but evading review."

The circuit court went on to address the public interest exception to the mootness doctrine. In that regard, the court stated:

The *Dixon* case describes the second exception to the mootness doctrine on appellate review as one that "allows us to express our views on the merits of a moot case to prevent harm to the public interest. *Dixon*, 230 Md. App. at 3 (citation omitted). Certainly there is a strong public interest in the timely admission and restoration of incompetent defendants.

The court stated that, for the appellees committed to Spring Grove, the wait for admission was two to three months. It continued:

> [A] delay of two or more months can be fatal to a criminal prosecution, especially one involving civilian witnesses. Witnesses can move; victims lose interest over time. The State has a vital interest in the prompt admission of defendants who are incompetent to stand trial and in the restoration of their competence.

Accordingly, the court found that the issue of delay in hospital admission was reviewable, not only under the capable of repetition but evading review exception, but also because "enforcing commitment orders under Crim. Proc. §§ 3-105 and 3-106 prevents harm to and serves the public interest."

We agree with the circuit court's decision not to dismiss the case pursuant to the mootness doctrine because the controversy was "capable of repetition, but evading review." Given the short time-frame involved with the delay in admitting appellees to a psychiatric hospital (ranging from 18-64 days), it is unlikely that court proceedings regarding delay could be initiated and resolved prior to appellees' admissions. Based upon the reasoning in *Powell* and *Dixon*, the circuit court properly denied the motion to dismiss the proceedings at that point as moot.

We note that the situation presented in this case is not likely to occur in the future. Effective October 1, 2018, the General Assembly amended CP § 3-106(c) to provide a deadline for admitting defendants to a Department hospital after a court order, imposing a

30

penalty for noncompliance with that deadline.  The statute now provides that, when a court

commits a defendant to the Department, the Department shall:

> (i) admit the defendant to a designated health care facility as soon as possible, but not later than 10 business days after the [Department] receives the order of commitment; and

> (ii) notify the court of the date on which the defendant was admitted to the designated health care facility.

CP § 3-106(c)(2).  If the Department does not admit a defendant to a designated

health care facility within the time period specified:

> the court may impose any sanction reasonably designed to compel compliance, including requiring the [Department] to reimburse a detention facility for expenses and costs incurred in retaining the defendant beyond the time period specified in paragraph (2)(i) of this subsection at the daily rate specified in § 9-402(b) of the Correctional Services Article.

CP § 3-106(c)(3).

At the time the circuit court made its ruling, however, this statute was not in

effect.  Accordingly, as indicated, the court properly found that the issue was

"capable of repetition but evading review," and it declined to dismiss the case as

moot.[25]

---

[25] Despite the new statute, the Department and its officials have the right to appeal the contempt order, which leaves them "adjudged to have willfully violated a court order and may . . . subject [them] to future punishment." *Bryant v. Howard Cty. Dep't. of Soc. Services*, 387 Md. 30, 45 (2005).

## II.

## Validity of the Contempt Finding

The Court of Appeals has indicated that a violation of a commitment order may be the basis for a contempt finding. *Powell*, 455 Md. at 546.[26] The State contends, however, that the circuit court erred in its finding here that the Department was in constructive civil contempt, listing several grounds of error.

First, the State contends that the "circuit court erred in holding the Department in contempt … for violating orders with which it had already complied." It asserts that "[t]he entry of a constructive civil contempt finding requires an order with which the alleged contemnor has not complied at the time of the contempt finding."

Second, the State argues that, because the Department had no beds available for the committed defendants on the dates "that the commitment orders directed transport to either Perkins or Spring Grove," the Department did not have the ability to comply with the court orders. It contends that, without evidence that it could have complied with the commitment orders earlier than it did, the court erred in holding the Department and its officials in contempt.

Third, the State asserts that the "Department did not willfully violate the court order." In this regard, the State argues that the Department was making efforts to increase

---

[26] In *Powell*, 455 Md. at 542, appellants argued that the Department violated CP § 3-106(b) by failing to admit them to a facility by the deadline set by the court in the commitment order. The Court held that, although this was not a violation of the statute, "[i]f a court order has been violated, a party with standing, or the court itself, may institute contempt proceedings for that violation." *Id.* at 546–47.

32

the availability of beds, and "[t]here was no evidence that the Department deliberately disregarded either court orders or its obligation to admit and treat patients committed to the Department." It asserts that, in finding a willful failure to comply, the court failed to apply the proper standard, relying on "activities or omissions that occurred well before entry of the underlying commitment orders" and "punishing the Department for its past decisions" relating to the need for additional hospital beds.

Finally, the State contends that the commitment orders were not sufficiently specific. It asserts that "the orders did not contain a specific date by which the Department was supposed to admit the committed defendants."

We begin with the State's first contention, that the contempt orders were invalid because the "Department complied with [ ] all of the court orders before either finding of contempt." The State makes two arguments in this regard. First, it argues that, because the Department had admitted each appellee to either Spring Grove or Perkins prior to the time of the contempt filing, "there was nothing further for the Department to do under the terms of any of the commitment orders," and the "court erred in holding the Department in contempt . . . for violating orders for which it had already complied." Second, the State contends that "there was no violation of the express terms of any of the commitment orders at the time that the court issued the show cause orders," asserting that, "[a]lthough the orders directed inpatient admission, they did not direct that the admission occur by a certain date."

Addressing the second contention first, we are not persuaded. The orders all directed that appellees be transported by DPSCS to a designated facility, either

33

immediately or by a certain date. And the expectation was that appellees would be admitted to the facility upon arrival. As the Court of Appeals noted in addressing a different issue regarding delayed compliance with a commitment order providing for DPSCS to transport immediately to a Department facility: "Presumably, the drafter of the form contemplated immediate admission to the hospital as well – as opposed to waiting indefinitely outside the door of the facility." *Powell*, 455 Md. at 544.[27] The failure to admit appellees until weeks or months after the date specified in the orders was a violation of the commitment orders, which were sufficiently specific regarding when the Department was to admit the committed defendants.[28]

We thus turn to the State's argument that, because the Department ultimately complied with the court orders and admitted appellees to a psychiatric hospital, there was no basis for a finding of constructive civil contempt. This argument requires more extensive analysis to resolve.

---

[27] Indeed, the evidence indicates that the Department understood its obligation to admit appellees on the date they were transported to the hospitals. Mr. Brown testified that, upon receipt of the court order directing DPSCS to transport Mr. Taylor to Perkins on July 17, 2017, he wrote a letter to the court, dated July 14, 2017, that indicated the lack of beds at the hospital. Clearly, Mr. Brown interpreted the court order as requiring that Mr. Taylor be admitted on July 17, 2017, the date he was scheduled to be transported to Perkins.

[28] To determine whether this violation justified a contempt finding, we still must address whether the Department willfully violated the order or had the ability to comply earlier, as well as whether subsequent compliance precludes a finding of constructive civil contempt.

Appellees do not contest the factual basis for this claim, i.e., that they had been admitted to the hospital by the time of the initial contempt findings. They argue, however, that the contempt findings were proper because

> the show cause orders presented ongoing issues to be resolved and [ ] they were designed to compel future compliance with court orders. Without a contempt order to ensure future compliance, possibly even compliance as to the same [a]ppellees, the Department would be free to violate court orders. The circuit court was properly exercising its discretion to prevent this from happening.

To address this contention, we must keep in mind that "a civil contempt proceeding is intended to preserve and enforce the rights of private parties to an action and to compel obedience to orders and judgments entered primarily for their benefit." *Arrington*, 402 Md. at 93. Such a proceeding "is remedial, rather than punitive, in nature, intended to coerce future compliance, and, accordingly, 'a penalty in a civil contempt must provide for purging.'" *Id.* (quoting *Roll*, 267 Md. at 728). *Accord Lynch v.* Lynch, 342 Md. 509, 529 (1996) ("[C]ivil contempt requires a purge provision with which the defendant is able to comply in order to purge, *i.e.,* clear or exonerate, him or herself of the contempt."). The Court of Appeals has made clear that a person cannot be found in constructive civil contempt unless he or she "has the *present* ability to comply with the earlier order or with the purging provision." *Dodson,* 380 Md. at 450.[29]

---

[29] Maryland Rule 15-207(e) provides an exception to this rule in situations where a defendant has not complied with court orders relating to spousal or child support. In such cases, the present inability to comply with the support order or meet a purge does not preclude a finding of contempt. *Arrington v. Dep't of Human Res.*, 402 Md. 79, 97 (2007). As stated *supra*, Rule 15-207(e) is not applicable to the facts of this case.

We find *Dodson* instructive. In that case, after the parties divorced and Mr. Dodson was ordered to pay the insurance on the parties' condominium, a fire broke out in the condominium unit and caused substantial damage. *Id.* at 440–41. When the Dodsons contacted the insurance company to report the damage to the contents of the condominium, they were advised that, several weeks prior to the fire, the insurance policy on the condominium had been cancelled for nonpayment. *Id.* at 441. Mrs. Dodson then filed a petition to hold Mr. Dodson in contempt. *Id.* at 442. The circuit court found Mr. Dodson in civil contempt and ordered him to pay compensatory damages of $19,311 to Mrs. Dodson. *Id.* at 444.

In reversing the circuit court's order, the Court of Appeals stated:

> Although we have repeatedly stated that the sanction in civil contempt actions is "remedial," our opinions have explained that "remedial" in this context means to coerce compliance with court orders for the benefit of a private party or to issue ancillary orders for the purpose of facilitating compliance or encouraging a greater degree of compliance with court orders. We have not used the term "remedial" to mean a sanction, such as a penalty or compensation, where compliance with a prior court order is no longer possible or feasible.

*Id.* at 448.

The Court of Appeals noted that Mr. Dodson

> had no present ability to comply with any requirement that the insurance premium due on November 1, 2000, be paid so that there would be no December 2000 cancellation of the insurance policy on the condominium's contents. There has been no suggestion in this case that James Dodson is presently failing to pay any insurance premiums which he is obligated to pay or that he has failed to pay any such premiums since December 2000.

> Unlike every other case in this Court which has upheld a constructive civil contempt sanction, this case involves no current obligation under a court order. Instead, the only failure to comply with a court order was a single

episode of inaction which took place in the fall of 2000. The direct adverse result, namely the cancellation of the insurance policy, was a one-time event in December 2000, and it is over with. It is not possible to reinstate the insurance policy retroactive to December 2000 when the fire occurred.

The purpose of Amelia Dodson's civil contempt action was to impose a sanction upon James Dodson for a past failure to comply with a court order. This Court has consistently held that a civil contempt action will not lie for such purpose. *See, e.g., Lynch v. Lynch, supra,* 342 Md. at 529, 677 A.2d at 594; *Rutherford v. Rutherford, supra,* 296 Md. at 357, 464 A.2d at 233; *Elzey v. Elzey, supra,* 291 Md. at 375–376, 435 A.2d at 448; *State v. Roll and Scholl, supra,* 267 Md. at 728, 730, 298 A.2d at 876, 877. Under the circumstances of our prior cases, we have pointed out that a constructive criminal contempt action is the appropriate means to punish a past willful violation of a court order. Under circumstances like those in the case at bar, a tort action sounding in negligence or a breach of contract action would be the appropriate means for the injured party to seek compensation.

*Id.* at 451–52.[30]

Thus, pursuant to *Dodson,* a civil contempt action is not appropriate to impose a sanction for "a past failure to comply with a court order." *Id.* at 452. Yet that appears to be what happened in this case.[31]

---

[30] The Court stated that, "ordinarily," compensatory damages may not be recovered in a civil contempt action. *Dodson,* 380 Md. at 454. It went on to state, however, that the case did not present the issue whether, under exceptional circumstances, a monetary award might be appropriate. *Id.* This Court subsequently held, in *Royal Inv. Group, LLC v. Wang,* 183 Md. App. 406, 455 (2008), *cert. granted,* 408 Md. 149 (2009), *appeal dismissed,* 409 Md. 413, 435 (2009), that, under "exceptional circumstances," a "willful violation of a court order, which clearly caused the plaintiff a monetary loss, can form the basis for a monetary award in a civil contempt case."

[31] This Court's opinion in *Gertz v. Md. Dep't of Env't,* 199 Md. App. 413, 427–28, *cert. denied,* 423 Md. 451 (2011), in which we upheld a monetary award as a civil contempt sanction for a past failure to comply with an earlier court order, may appear, at first glance, to be inconsistent with the *Dodson* principles, but when viewed under the unique facts of that case, it is not. In that case, the 2009 contempt order required Gertz to pay an agreed to fine of $72,000 for the willful violation of a 2004 contempt order. *Id.* at 422. We held

37

Although the circuit court here was understandably frustrated by what it termed a systemic "problem of delays in admission," much of the court's opinion was devoted to a discussion of past conduct by the Department and its officials after "years of notice regarding the problem." The court extensively discussed the prior "actions, inactions, and omissions" of the Department and its officials and the decisions that "caused the persistence and recurrence of the admission delay problem," which resulted in a situation where "[u]ntold individuals suffering from acute and painful mental illness have languished in jails for months at a time."

The court did not focus on the fact that, at the time of the contempt findings, there was no way for the Department or its officials to do anything else to comply with the specific court orders at issue. The Department could not, at that point, admit appellees to a Department facility because they already had been admitted. And, as in *Dodson*, 380 Md. at 451, where Mr. Dodson had no "*present* ability to comply with any requirement that the insurance premium due on November 1, 2000, be paid so that there would be no December 2000 cancellation of the insurance policy," the Department, at the time of the hearing, similarly had no present ability to admit the appellees to a facility by the earlier date specified in the orders. At the point when the court made its contempt findings, there was no evidence that the Department had a current obligation under a court order. Rather, the civil contempt finding was based on a past failure to comply with the court orders.

---

that the $22,000 suspended fine "clearly qualifie[d] as a remedial sanction designed to compel future compliance." *Id.* at 426. With respect to the remaining $50,000, we held that this sanction was proper because Gertz had agreed to the imposition of a monetary sanction if he violated the court order. *Id.* at 428. There was no agreement in this case.

The question presented here involves delayed compliance. In other words, when a party does not timely comply with a court order, but the party ultimately complies with the order prior to the contempt finding, is it proper to find that party in constructive civil contempt? This is an issue of law, which we review *de novo*.

Courts in other jurisdictions have reached differing conclusions. In *Roach v. Roach*, 572 N.E.2d 772, 777 (Ohio Ct. App. 1989), the Court of Appeals of Ohio held that delayed compliance with a court order is subject to a finding of civil contempt, even if there has been compliance before the contempt hearing. In that case, the court upheld a finding of civil contempt, even though Mr. Roach had paid all arrearages of alimony prior to the hearing, noting that "'[t]he purpose of contempt proceedings is to secure the dignity of the courts and the *uninterrupted* and unimpeded administration of justice.'" (quoting *Windham Bank v. Tomaszczyk*, 271 N.E.2d 815, 816 (Ohio 1971)). *See also In re Contemnor Caron*, 744 N.E.2d 787 (Ct. Com. Pl. Ohio 2000) (Father was in civil contempt as of the day before the contempt hearing for failure to pay court-ordered child support, but because he purged himself by payment of all arrearages the day before the hearing, court suspended the incarceration sanction.).

Other courts, however, have held that "'[c]ivil contempt is inappropriate where a defendant has complied with the previous court orders prior to the contempt hearing.'" *Gandhi v. Gandhi*, 779 S.E.2d 185, 214 (N.C. Ct. App. 2015) (quoting *Watson v. Watson*, 652 S.E.2d 310, 319 (N.C. Ct. App. 2007). Thus, in *Hudson v. Hudson*, 230 S.E.2d 188, 189–90 (N.C. Ct. App. 1976), where Mr. Hudson failed to comply with a court order to pay child support, but he made payments in full prior to the date of the hearing, the court

39

determined that Mr. Hudson had purged himself of any possible contempt, and it vacated the finding of contempt. The court explained that the purpose of a civil contempt proceeding "is to force the defendant's compliance with the court's order." *Id.* at 190.

Similarly, in *In re Marriage of Berto*, 800 N.E.2d 550, 556 (Ill. Ct. App. 2003), the Appellate Court of Illinois held that a father could not be held in civil contempt for his failure to timely pay child support where, at the time of the contempt hearing, he had paid the full amount due. The court stated that, because the purpose of civil contempt is to coerce compliance with a court order, a court in a civil contempt proceeding "seeks only to secure obedience to its prior order." *Id.* Once the father had tendered the arrearage, he was in compliance. *Id.* Moreover, the court stated that a "finding of civil contempt is not proper unless the means to purge the alleged contempt is within the power of the contemnor." *Id.* Once the father paid the arrearage, "there was no means left by which [he] could 'purge' himself of the alleged contempt, and accordingly, no basis to find [him] in contempt." *Id.* Noting the distinction between civil and criminal contempt, the court concluded:

> Holding respondent in indirect civil contempt of court after he presented his $30,000 arrearage would not have had the effect of *coercing* respondent to make the full support payments due for the previous three months, but rather would have *punished* him for failing to make the support payments at the time petitioner was entitled to receive them. Respondent's unilateral reduction of amounts of support that petitioner was entitled to were past acts that he could not undo. Because coercion is the goal of indirect civil contempt of court and punishment is the goal of criminal contempt of court, respondent could not have properly been held in indirect civil contempt of court as a method of punishing him for his past misconduct.

*Id.* at 557.

After reviewing the case law, we hold that a party generally may not be held in constructive civil contempt for delayed compliance with a court order if he or she has complied with the order prior to the contempt finding. Because the purpose of civil contempt is to coerce compliance with a court order, once the party has done what he or she was ordered to do, compliance has been achieved, and there is nothing to coerce. Holding the party in civil contempt at that point does not have the effect of coercing compliance, but rather, of punishing the party for the past failure to comply. In a case where compliance with a court order is delayed, but there is ultimate compliance prior to the contempt hearing, a court generally is limited to proceeding against the party for criminal contempt, where punishment for a past violation of a court order is permissible.[32]

The circuit court erred in finding the Department in constructive civil contempt when, at the time of the hearing, it had complied with the court orders and admitted appellees to Department facilities. Given our conclusion in this regard, we need not consider the Department's other contentions of error.

---

[32] One potential exception to this rule is where a civil contempt order is issued, not to coerce compliance, but to compensate the complainant for actual losses. *See Ransom v. JMC Leasing Specialties, LLC*, 505 S.W.3d 737, 741–42 (Ct. App. Ark. 2016) (Because civil contempt could be compensatory or coercive in nature, Ransom was properly found in civil contempt for failing to timely deliver a certificate of title, even though he had sent the title prior to the date of the contempt hearing, noting that fines and costs were to compensate the other party for the expenses incurred due to Ransom's delay in complying with the court order.); *Royal*, 183 Md. App. at 455 ("[U]nder 'exceptional circumstances,' a willful violation of a court order, which clearly causes the plaintiff a monetary loss, can form the basis for a monetary award in a civil contempt case."). The contempt order here was not issued to compensate appellees for any losses.

41

**JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED. COSTS TO BE PAID BY APPELLEES.**